**THE ROSEN LAW FIRM, P.A.**
Phillip Kim, Esq.
Jing Chen, Esq.
275 Madison Ave., 34th Floor
New York, New York 10016
Telephone: (212) 686-1060
Fax: (212) 202-3827
Email: pkim@rosenlegal.com
         jchen@rosenlegal.com

*Counsel for Plaintiffs and Class*

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| BRADLEY THOMAS, Individually and on behalf of all others similarly situated,<br><br>    Plaintiff,<br><br>    v.<br><br>CHINA TECHFAITH WIRELESS COMMUNICATION TECHNOLOGY LIMITED, DEFU DONG, DEYOU DONG, and YUPING OUYANG, DELOITTE TOUCHE TOHMATSU CERTIFIED PUBLIC ACCOUNTANTS LLP, AND FRIEDMAN LLP.<br><br>    Defendants. | Case No: 1:19-cv-00134-FB-CLP<br><br>AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS<br><br>JURY TRIAL DEMANDED |

Lead Plaintiff Bradley Thomas and named plaintiffs Chenyan Zhu, and David Manzo ("Investors" or "Plaintiffs"), individually and on behalf of all other persons similarly situated, by their undersigned attorneys, allege the following based upon personal knowledge as to themselves and their own acts, and upon information and belief as to all other matters based on the investigation conducted by and through their attorneys, which included, among other things, a review of U.S. Securities and Exchange Commission ("SEC") filings by China Techfaith Wireless

Communication Technology Limited ("Defendant China Techfaith" or the "Company"), wire and press releases published by and regarding Defendant China Techfaith, securities analysts' reports, news stories, witness interviews, and the review of other publicly available information. The Investors believe that substantial additional evidentiary support will exist for the allegations set forth herein.

## NATURE OF THE ACTION

1.  This is a federal securities class action on behalf of a class consisting of all persons or entities, other than defendants, who purchased or otherwise acquired Defendant China Techfaith American Depositary Shares ("ADS") during the period from September 2, 2014 through and including December 20, 2018 (the "Class Period"), seeking to recover damages for violations of Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder.

2.  This case arises from undisclosed related party transactions of ChinaTechfaith, a company listed on NASDAQ since May 2005.

3.  The two brothers who run the Company, Defendant Deyou Dong, current Chairman ("Defendant Dyou"), and Defendant Defu Dong, former Chairman ("Defendant Defu"), have together caused China TechFaith to engage in undisclosed related party transactions with Defendant Defu's privately-owned companies that, over the years, have effectively stolen nearly all of the Company's business and assets and caused the Company's performance to continuously deteriorate and become an unprofitable shell of its former self.

4.  Defendant China Techfaith is a Cayman Islands company with headquarters in Beijing, China.  It has two business lines: designing mobile handsets for its own brand names and for third party brands, and commercial real estate business.

5.      Defendant Defu founded China Techfaith in July 2002. Defendant Defu had been the CEO until May 2015 when he passed the title to his younger brother Defendant Deyou. He also had been the Chairman of the Board of Directors of the Company since its inception and passed the Chairman position to Defendant Deyou at a some point in time between April 27, 2017 and April 27, 2018[1]. The Company did not make any announcement as to the details of the change of the Chairman. Defendant Defu was the sole controlling shareholder of the Company and had controlled 32.8% ownership of ChinaTechfaith until in 2017 he transferred approximately 97.7% of all shares he owned to his younger brother Defendant Deyou "for the purpose of family asset planning and to align the interests of the Issuer's shareholders and the management". [2] Thereafter, Defendant Defu has held roughly 0.7% ownership of the Company.[3]

6.      Defendant Deyou, the younger brother of Defendant Defu, joined China Techfaith in 2007, acting as general manager of sales department. He has been the director and Chief Operating Officer of China Techfaith since August 2009, President since 2011 and CEO since May 2015.

7.      At some time between April 27, 2017 and April 27, 2018, Defendant Deyou became the Chairman of the Board of Directors of China Techfaith. Sometime around when Defendant Deyou received the majority of the Company shares from his older brother Defendant Defu, Defendant Deyou also exercised options to purchase additional China TechFaith shares. So as of

---

[1] Defendant Defu was listed as the Chairman of the Board of Directors of the Company in Form 20-F 2016 Annual Report filed with SEC on April 27, 2017. Defendant Deyou was listed as the Chairman in Form 20-F 2017 Annual Report filed with the SEC on April 27, 2018. Defendant China Techfaith never made any disclosure as to when such change took place.

[2] https://www.sec.gov/Archives/edgar/data/1316317/000119312518012733/d462592dsc13d.htm

[3] https://www.sec.gov/Archives/edgar/data/1316317/000119312518012749/d462597dsc13ga.htm; https://www.sec.gov/Archives/edgar/data/1316317/000119312518012738/d462593dsc13ga.htm

April 27, 2018 when China TechFaith's 2017 Annual Report on Form 20-F was filed, Defendant Deyou owned 32.5% of the Company and was the sole controlling shareholder of the Company.

8.      During the class period, Defendant China Techfaith and Individual Defendants failed to disclose in the Company's 2014 to 2017 Annual Reports many related party transactions that China Techfaith conducted with Defendant Defu's privately owned company Beijing Mfox Technology Company Limited (北京云狐时代科技有限公司, hereinafter "Mfox Technology").

9.      Additionally, China Techfaith's 2017 Annual Report filed with the SEC on April 27, 2018 disclosed that in December 2017, China Techfaith provided a loan of $53.794 million (RMB 350 million), which was tantamount to 1.15 times of China Techfaith's entire 2017 annual net revenue, to an allegedly "unrelated third party" electronics manufacturing services factory to "fund [that  factory's] capital demand of production"[4]. Unbeknownst to the investors, such so-called unrelated third party actually was the manufacturing factory owned by Mfox Technology, Defendant Defu's privately owned company in Shenyang, China.

10.     Defendant China Techfaith and Individual Defendants also failed to disclose that two out of the three trademarks that China Techfaith claimed to own and used for its own brand name mobile phones were actually owned by Mfox Technology.

11.     Furthermore, Defendant China Techfaith and Individual Defendants failed to disclose that at least two real estate projects in Shenyang and Hangzhou that China Techfaith invested in and developed were actually developed for the benefit of Mfox Technology.

12.     Additionally, Defendant China Techfaith and the Individual Defendants failed to disclosed that the business of China Techfaith has been co-mingled with Mfox Technology for

---

[4] 2017 Annual Report pg F-19.   The Company's SEC filings refer to electronics services factories as "EMS factories".

years and China Techfaith is just one of the many companies that form part of Defendant Defu and Defendant Deyou's family owned conglomerate.

13.     SEC regulations and federal common law mandate that all material related party transactions be disclosed in annual reports and financial statements. Failure to disclose the related party transactions rendered the Company's annual reports issued to investors during the Class Period false and misleading.

14.     In addition, Generally Accepted Accounting Principles ("GAAP") mandate that all material related party transactions be disclosed in the Company's financial statements.  Defendants' failure to disclose the material related party transactions in the Company's financial statements was a violation of GAAP and rendered false and misleading each of the Company's annual financial statements issued to investors during the Class Period.

15.     China TechFaith's failure to disclose the material related party transactions with Defu and his companies, including Mfox Technology violated GAAP, and SEC regulations and rendered China TechFaith's financial statements false and misleading.

16.     Auditor Defendant Deloitte Touche Tohmatsu Certified Public Accountants LLP ("Auditor Defendant Deloitte") was China Techfaith's auditor for the years ended December 31, 2014. Auditor Defendant Friedman LLP was China Techfaith's auditor for the years ended December 31, 2015, 2016 and 2017. Each of the auditors certified that it had audited China Techfaith's financial statements in accordance with the Public Company Accounting Oversight Board (United States) ("PCAOB") auditing standards. Deloitte and Friedman both expressed unqualified opinions on those financial statements and financial statement schedules issued during the class period. But accounting rules mandate disclosure of related party transactions in the

company's financial statements, and the auditing standards that governed Deloitte's and Friedman's audits set out steps they must follow to obtain a list of related parties. These steps included carefully investigating unusual or suspicious transactions – like China Techfaith's enormous loan and real estate investment for the benefit of Mfox Technology – and checking public records to determine whether there are any related parties that management had not disclosed. Deloitte and Friedman did not follow these auditing standards, because they did not check public records showing the intertwined relationship between China Techfaith and Mfox Technology, particularly given the glaring facts that Defendant Defu and Defendant Deyou are brothers, and that Defendant Defu exited out from his role as Chairman and controlling shareholder of the Company and formed his own private company that operates in the same industries and a the same location. Thus, Deloitte's and Friedman's statements that their audit had comported with PCAOB auditing standards were false.

17.     The Dong Brothers' related party transactions caused the Company's revenue and profit to decline.  It also diminished the value of its assets.  When the damage to the Company's financial condition was disclosed over time, the value of China TechFaith shares declined, damaging investors.

## JURISDICTION AND VENUE

18.     The claims asserted herein arise under and pursuant to §§10(b) and 20(a) of the Exchange Act (15 U.S.C. §§78j(b) and §78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. §240.10b-5).

19.     This Court has jurisdiction over the subject matter of this action under 28 U.S.C. §1331 and §27 of the Exchange Act.

20.     Venue is proper in this judicial district pursuant to §27 of the Exchange Act (15 U.S.C. §78aa) and 28 U.S.C. §1391(b) as a significant portion of Defendants' actions, and subsequent damages, took place within this judicial district.

21.     In connection with the acts, conduct and other wrongs alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mail, interstate telephone communications and the facilities of the national securities exchange.

## PARTIES

22.     Investors Lead Plaintiff Bradley Thomas purchased China Techfaith ADSs during the Class Period and was damaged thereby.   Investors's PSLRA certification was previously filed with the Court and is incorporated by reference herein.  *See* ECF No. 6-2.

23.     Named plaintiff Chenyan Zhu purchased China Techfaith ADSs during the Class Period and was damaged thereby.  Investors' PSLRA certification is attached hereto as Exhibit 1.

24.     Named plaintiff David Manzo purchased China Techfaith ADSs during the Class Period and was damaged thereby.  Investors's PSLRA certification is attached hereto as Exhibit 2.

25.     Defendant China Techfaith is a Cayman Islands company based in Beijing, China. Its principal executive offices are located at Tower D, Mfox Plaza, Ke Chuang 12th Street, Beijing Economic-Technological Development Area (Yi Zhuang), Beijing, China 101111, the same building of Defendant Defu's privately-owned company Mfox Technology. [5]Defendant China Techfaith's ADSs[6] are listed on NASDAQ under the ticker symbol "CNTF."

---

[5]   China Techfaith's 2017 Annual Report names the building as Mfox Plaza. Mfox Technology calls the building as Hongkunyun Times. They are the same building.
http://chanye.focus.cn/park/details_7001868/; also see http://www.mfox.cn/xwzx-contact.html
[6] Each ADS represents 75 ordinary shares of China Techfaith.

26.     Defendant Defu founded China Techfaith in July 2002, He had been the Chairman of the Board of Directors of the Company since its inception and passed the Chairman position to his younger brother Defendant Deyou at a some point in time between April 27, 2017 and April 27, 2018. [7] Defendant Defu also had been the CEO until May 2015 when he passed the title to Defendant Deyou. Defendant Defu was the sole controlling shareholder of the Company and had controlled 32.8% ownership of China Techfaith until in 2017 he transferred 254,695,000 ordinary shares which was approximately 97.7% of all shares he owned to his younger brother Defendant Deyou for the purported "purpose of family asset planning and to align the interests of the Issuer's shareholders and the management". [8] Defendant Defu still owns 6,000,000 ordinary shares as of today, which constitutes roughly 0.7% ownership of the Company. [9]

27.     Defendant Deyou, the younger brother of Defendant Defu, joined China Techfaith in 2007, acting as general manager of its sales department. He has been the director and Chief Operating Officer of China Techfaith since August 2009, President since 2011 and CEO since May 2015.

28.     Sometime between April 27, 2017 and April 27, 2018, Defendant Deyou became the Chairman of the Board of Directors of China Techfaith. Sometime around when Defendant Deyou received 254,695,000 ordinary shares of the Company from his older brother Defendant Defu, Defendant Deyou also exercised some share options. So as of April 27, 2018 when the

---

[7] Former Chairman Defu was listed as the Chairman of the Board of Directors of the Company in Form 20-F 2016 Annual Report filed with SEC on April 27, 2017. Defendant Deyou was listed as the Chairman in Form 20-F 2017 Annual Report filed with the SEC on April 27, 2018. Defendant China Techfaith never made any disclosure as to when such change took place.
[8] https://www.sec.gov/Archives/edgar/data/1316317/000119312518012733/d462592dsc13d.htm
[9] https://www.sec.gov/Archives/edgar/data/1316317/000119312518012749/d462597dsc13ga.htm; https://www.sec.gov/Archives/edgar/data/1316317/000119312518012738/d462593dsc13ga.htm.

Company's 2017 Annual Report on Form 20-F was filed, Defendant Deyou owned a total of 257,695,000 ordinary shares, i.e. 32.5% ownership of the Company and was the sole controlling shareholder of the Company.  Defendant Deyou received a diploma in accounting from the Jilin University of Agricultural Science And Technology in 1997.

29.    Defendant Yuping Ouyang ("Defendant Ouyang") has been Defendant China Techfaith's Chief Financial Officer ("CFO") since August 2008 and throughout the Class Period. Defendant Ouyang worked in various financial positions at the Company, including as the US GAAP reporting manager and chief accounting officer. Defendant Ouyang is also a licensed member of the Certified Public Accountants of Washington State and a member of the Association of Chartered Certified Accountants. Defendant Ouyang received her MBA from the Sun Yat-sen University in 2006 and her bachelor's degree in management from the Guangdong University of Foreign Studies in 1996.

30.    Defendants Defu, Deyou and Ouyang are collectively referred to herein as the "Individual Defendants."

31.    Defendant China Techfaith and Individual Defendants are collectively referred to herein as "China Techfaith Defendants".

32.    Each of the Individual Defendants:

(a)    directly participated in the management of the Company;

(b)    was directly involved in the day-to-day operations of the Company at the highest levels;

(c)    was privy to confidential proprietary information concerning the Company and its business and operations;

(d)     was directly or indirectly involved in drafting, producing, reviewing and/or disseminating the false and misleading statements and information alleged herein;

(e)     was directly or indirectly involved in the oversight or implementation of the Company's internal controls;

(f)     was aware of or recklessly disregarded the fact that the false and misleading statements were being issued concerning the Company; and/or

(g)     approved or ratified these statements in violation of the federal securities laws.

33.     The Company is liable for the acts of the Individual Defendants and its employees under the doctrine of *respondeat superior* and common law principles of agency because all of the wrongful acts complained of herein were carried out within the scope of their employment.

34.     The scienter of the Individual Defendants and other employees and agents of the Company is similarly imputed to the Company under *respondeat superior* and agency principles.

35.     Defendant Deloitte Touche Tohmatsu Certified Public Accountants LLP ("Auditor Defendant Deloitte") was China Techfaith's auditor for the years ended December 31, 2004 to December 31, 2014. Auditor Defendant Deloitte's principal offices are located at 12/F, China Life Financial Center, No. 23, Zhenzhi Road, Chaoyang District, Beijing, PRC, 100026.

36.     Defendant Friedman LLP ("Auditor Defendant Friedman") was the Company's auditor for the years ended December 31, 2015 to December 31, 2017. Auditor Defendant Friedman's principal offices are located at One Liberty Plaza, 165 Broadway, Floor 21, New York, New York, 10006.

37.     Auditor Defendant Deloitte and Auditor Defendant Friedman are the "Auditor Defendants".

38.     Defendant China Techfaith, the Individual Defendants and Auditor Defendants Deloitte and Friedman are referred to herein, collectively, as the "Defendants."

**RELATED PARTY**

39.     Beijing Mfox Technology Company Limited ("Mfox Technology"), is a private Chinese company founded in 2010[10]. Its name has also been translated into other English variations such as Yunhu Times Technology Limited or Yunhu Shidai Technology Limited. But they all refer to the same company and its Chinese name is 北京云狐时代科技有限公司. Its headquarters are located at Tower D, Mfox Plaza, Ke Chuang 12th Street, Beijing Economic-Technological Development Area (Yi Zhuang), Beijing, China 101111.[11]  This is the same building in which China Techfaith is headquartered. Up until March 19, 2018, Defendant Defu Dong had 82% ownership of Mfox Technology. After March 19, 2018 when a new shareholder was added to Mfox Technology, Defendant Defu had approximately 78% ownership of Mfox. Defendant Defu has been Mfox Technology's legal representative[12], executive director and

---

[10] https://www.qixin.com/company/0c337ed9-937c-4e2c-bdb6-944b8d30ae8e. Defendants Defu and Deyou used various English names in China TechFaith's SEC filings to refer to the same Chinese characters used in Mfox Technology's company name, its trademark and its official website http://www.mfox.cn in order to hide from US investors the true relationship between Mfox and China Techfaith.   By translating the Chines characters for Mfox as Yunhu in China TechFaith's SEC filings rather than as Mfox, the Individual Defendants concealed that Mfox and Yunhu were one and the same company.

[11] http://www.mfox.cn/xwzx-contact.html.

[12] Under Chinese law, every company must have a legal representative, including when starting a company or opening a new business in the PRC.  A company's legal representative is the individual who serves as the legal embodiment of the company's interests for purposes of the Chinese government.    Under Article 7 of the PRC Company Law that law, the company's business license is required to contain that person's name and address, in addition to the company's registered capital and the scope of its business.  A legal representative is the only person with the power to bind the company in all matters, including entering into contracts, and who represents the company in submitting reports to Chinese regulatory bodies. He or she also signs the company's share certificates as well as any corporate bonds issued by the company.

general manager since July 23, 2015.[13] Attached as Exhibit 3, is a copy of Mfox Technology registration information downloaded from China National Enterprise Credit Information Publicity System, indicating Defendant Defu's ownership in Mfox Technology. Per Mfox Technology's official website, the two main businesses of Mfox Technology are (i) producing ruggedized mobile products, the exact business that has been contributing approximately 95% of Defendant China Techfaith's annual total revenue in 2015, 2016 and 2017[14], and (ii) providing low/no-code development platforms[15].

## SUBSTANTIVE ALLEGATIONS

### (i) Defendants Defu and Deyou colluded to funnel China Techfaith' assets to their private company in China.

40. From its IPO in May 2005 through about 2013, China Techfaith's business focused on mobile phones. Within this sector, China Techfaith had three lines of business – original design products, or ODP, branded phones, and mobile games.

41. Beginning in 2010, Defendants Deyou and Defu, two brothers who successively were the Chairman of China Techfaith's Board and its controlling shareholder, carried out a scheme to loot China Techfaith's business.

42. In June 2010, Defendant Defu formed a private company, Mfox. That company, like China Techfaith, was in the business of making and selling mobile phones. Defu owns the vast majority of Mfox's shares.

---

[13] https://www.qixin.com/company/0c337ed9-937c-4e2c-bdb6-944b8d30ae8e.
[14] https://www.sec.gov/Archives/edgar/data/1316317/000119312518136571/d513599d20f.htm.
[15] Low-code or no-code development is for people to design and build software applications without writing any or very little codes. Users can drag and drop application components, connect them together and create a mobile or web app on a low/no code development platform.

43.     Over the next five years, Deyou and Defu moved substantially all of China Techfaith's operations, personnel, and even cash, from China Techfaith to Mfox.

44.     Plaintiffs spoke with former employees of China Techfaith, who confirmed that China Techfaith refers to itself internally as a part of the Mfox Conglomerate. For example, Former Employee 1, an application test engineer who worked for China Techfaith from September 2013 through March 2015, confirmed this. Former Employee 1 also remarked that in 2012, the Mfox Conglomerate began to move China Techfaith's business and operations to Mfox.

45.     Over the next five years, according to reports China Techfaith and Mfox filed with various Chinese agencies, Mfox stole most of China Techfaith's assets:



46.     As a result of Deyou and Defu's theft, China Techfaith's financial performance and financial condition has completely deteriorated to the point of collapse as shown in the following chart:

| Year ended December 31 | Number of employees | Total revenues | Revenues from branded phones (a profitable niche) | Net income (loss) |
|---|---|---|---|---|
| 2011 | 470 | $323.8 million | $67.5 million | $27.1 million |
| 2012 | 358 | $137.7 million | $50.3 million | ($3.3 million) |
| 2013 | 286 | $120.7 million | $32.2 million | ($2.5 million) |
| 2014 | 225 | $99.3 million | $16.2 million | ($13.4 million) |
| 2015 | 135 | $64.6 million | Not disclosed | ($12.8 million) |
| 2016 | 118 | $61.0 million | Not disclosed | $10.1 million |
| 2017 | 115 | $46.8 million | Not disclosed | ($9.3 million) |

47.    Mfox sold the same products as China Techfaith. The products that Mfox Technology sold under its own trademarks are almost identical to those of China Techfaith's.



*Screen capture from China Techfaith's official website.* [16]





---

[16] http://www.techfaithwireless.com/

*Screen capture from Mfox Technology official website.* [17]

48.     China Techfaith claimed that it began to sell mobile phones under the "17FOX" brand in 2012 and started to sell mobile phones under its own "MOBIFOX" brand starting from 2013[18]. Yet according to the Trademark Office of the State Administration for Market Regulation of China, the sole government authority responsible for the registration and administration of trademarks in China, the trademark MOBIFOX was registered by Mfox Technology in 2015, and a subsidiary of Mfox Technology applied for registering the trademark 17FOX in 2012 and is awaiting the Trademark Office's substantive review. The Chinese characters of the trademark of a cell phone brand 云狐 (Chinese phonetic spelling: Yun Hu, i.e. Mfox's Chinese characters) that Defendant China Techfaith claims to own [19] was also registered by a subsidiary of Mfox Technology in 2012 and is awaiting the substantive review by the Trademark Office. The search results are attached as Exhibit 4 to this Amended Complaint.

49.     Having stolen China Techfaith's mobile phone business, Defendants then caused China Techfaith to enter – absurdly – the real estate business.

50.     China Techfaith is a technology company with no prior experience in or knack for real estate. Rather, Defendants caused China Techfaith to enter that business so that it could supply Mfox with office space.

51.     China Techfaith's 2013 Annual Report disclosed that it received approval from the Shenyang Government for the acquisition of approximately 11.5 acres in Shenyang City's Shenbei New District in December 2011. The new facility that China Techfaith was building there would

---

[17] http://www.mfox.cn/yhsc.html
[18] https://www.sec.gov/Archives/edgar/data/1316317/000119312514165694/d680990d20f.htm
[19] http://finance.sina.com.cn/stock/usstock/c/20130131/010414454937.shtml, last viewed on July 15, 2019.

include integrated research and development as well as sales and distribution capabilities. The land contract was valued at approximately RMB14.4 million (US$2.3 million). [20] However, unbeknownst to investors in the U.S., the office was built *for Mfox's use*. A photo of the property that China Techfaith built in Shenyang City's Shenbei New shows that the name of "Mfox Mobile Phone" stands in Chinese letters on top of the building. The gigantic stone sign in front of the building says "Mfox Technology Park" together with Mfox Technology's trademark a fox head. Indeed, Mfox's official website shows that Mfox Technology's manufacturing plant is located in Shenyang City's Shenbei New District[21].

---

[20] https://www.sec.gov/Archives/edgar/data/1316317/000119312514165694/d680990d20f.htm
[21] http://www.mfox.cn/xwzx-contact.html



*Screen capture China Techfaith's official website.* [22]

---

[22] http://www.techfaithwireless.com/english/products/Portfolio_TechParks_ShenYang_1.htm



*Photo downloaded from Mfox Technology official website.[23]*

52.   Similarly, China Techfaith claimed that it built two buildings in Hangzhou in 2010, and a third in 2013 as part of "its business expansion strategy … with the primary purpose of developing [its] own smart phone manufacturing capacity and strengthening [its] research and development capabilities in handset design and gaming development."[24]   China Techfaith's 2017 Annual Report still shows that it "owned and managed its real estate portfolio consisting of three completed buildings in Hangzhou". In fact, a photo on China Techfaith's website shows the name of "Mfox Mobile Phone" on top of the building together with Mfox Technology's trademark the fox head.

---

[23] http://www. mfox.cn/index.html

[24] https://www.sec.gov/Archives/edgar/data/1316317/000119312514165694/d680990d20f.htm



*Screen capture from China Techfaith's official website.* [25]

---

[25] http://www.techfaithwireless.com/english/products/Portfolio_TechParks_HangZhou_1.html

53.     China Techfaith's 2017 Annual Report also states that it was constructing another four buildings in Hangzhou. As of December 31, 2017, China Techfaith had invested approximately US$147.3 million in the construction of our facilities in Hangzhou. The capital expenditure in connection with the facilities in Hangzhou is expected to be US$11.3 million in aggregate in the next three years. Plaintiffs interviewed a local real estate broker The local real estate broker confirmed to Investors's investigators that China Techfaith's Hangzhou park, initially named "China TechFaith Technology Park" (德信无线科技园), and located at the corner of Changhe Road and Binan Road in Binjiang District of Hangzhou, changed its name to Mfox Technology park in Chinese (云狐时代科技).

54.     Indeed, China Techfaith's principal executive offices are located at Tower D, Mfox Plaza, Ke Chuang 12th Street, Beijing Economic-Technological Development Area (Yi Zhuang), Beijing, China 101111, the same building of Defendant Defu's privately-owned company Mfox Technology and a building named after Mfox Technology.

### *The 2017 Loan*

55.     Not content with stealing China Techfaith's *operations*, in 2017, Deyou and Defu stole China Techfaith's *cash*.

56.     China Techfaith's Annual Report for the year ended December 31, 2017 (the "2017 Annual Report") reported that China Techfaith had made a loan of $53.8 million to "an unrelated third party". The loan amount totaled 1.15 times China Techfaith's entire 2017 revenues and left China Techfaith with only $700,000 in cash and cash equivalents as of December 31, 2017.

57.    Because it was a material transaction, China Techfaith filed the Loan Agreement as an exhibit to its 2017 Annual Report. China Techfaith's counterparty is Yingbai Technology (Shenyang) Limited ("Yingbai Technology").[26]

58.    In fact, "Yingbai Technology" is none other than Mfox's manufacturing plant located in Shenyang, China. **First**, the address provided for "Yingbai Technology" in the Loan Agreement, 129-4, Gouziyan Road, Xiuyuan 1st Street, Mobile Phone Industrial Park, Daoyi North Street, Shenbei New District, Shenyang, is Mfox's Shenyang manufacturing facility's.

EX-4.15 2 d513599dex415.htm EX-4.15

Exhibit 4.15

**Loan Agreement**

**Lender (hereinafter referred to as Party A): Techfaith Wireless Technology Group Limited**

Address: Tower D, MFOX Plaza, Kechuang 12th Street, Beijing Economic-Technological Development Area (Yi Zhuang), Beijing 101111, People's Republic China

**Borrower (hereinafter referred to as Party B): Yingbai Technology (Shenyang) Limited**

Address: 129-4, Gouziyan Road, Xiuyuan 1st Street, Mobile Phone Industrial Park, Daoyi North Street, Shenbei New District, Shenyang

**Party A**, Techfaith Group and its subsidiaries, including but not limited to Techfaith Wireless Communication Technology (Beijing) Limited (or "Techfaith China"), One Net Entertainment Limited (or "One Net"), Tecface Communication Technology (Beijing) Limited (or "Tecface Technology"), Techfaith Wireless Communication; Technology (Hangzhou) Limited (or "Techfaith Hangzhou"), Techfaith Wireless Communication Technology (Shanghai) Limited (or "Techfaith Shanghai"), Techfaith Wireless Communication Technology (Beijing) Limited (or "Techfaith Shenyang") and 17fox Technology (Shenyang) Co. Limited (or "17FOXSY") are high-tech companies specializing in R&D, manufacturing, sales of, and service related to mobile communications products in the Internet age.

**Party B** is a company specializing in the production of mobile communication products and provides production services for Party A's products.

In connection with Party B's application for a Borrowing from Party A, after negotiation between the parties, this contract is hereby concluded for mutual compliance.

Article 1 Purpose of the Borrowing: The Borrowing will be used for the normal business operations of Party B.

Article 2 Amount of the Borrowing: RMB 350 million (in words: RMB THREE HUNDRED AND FIFTY MILLION ONLY).

Article 3 Term of Borrowing, Interest Rate of the Borrowing and Repayment Arrangement

Page 1 of 4

*Loan Agreement showing* "Yingbai Technology's" *address in the first red box.*

---

26

https://www.sec.gov/Archives/edgar/data/1316317/000119312518136571/d513599dex415.htm



*Screen capture of Mfox Technology official website showing its address and an English translation thereof in the first red box.*

59.   ***Second***, Mr. Zhongbao Wang, who owns 35% of "Yingbai Technology's" shares and is one of its only two shareholders,[27] has been serving as the Supervisor of Techfaith Software

---

[27] https://www.qixin.com/company/d94dc8de-cb8e-4972-9ef8-1812830b427e, last viewed on July 15, 2019. Based on Yingbai Technology's 2016, 2017 and 2018 annual reports filed with Chinese governmental authorities, it changed its correspondence address from 129-4, Gouziyan

(China) Ltd., a key China Techfaith subsidiary, since at least 2015. Under Chinese corporate law, a Supervisor is a top-level executive, that closely oversees and directs a limited liability company's business.[28] Supervisors serve on a board of supervisors with rights similar to directors. In addition, supervisors may attend board of director meetings and seek to remove directors. A fuller description of the rights and obligations of supervisors is attached as Exhibit 5.

60.     Mr. Hailong Hu, who owns the remaining 65% of "Yinbgai Technology", owns a number of Chinese companies alongside Defendants Deyou and Defu.[29] For example, Hu and Defendant Deyou founded a China-based company Beijing Zhongsheng Ruibao Commerce and Trade Company Limited in 2000. [30]

*(ii)*     ***Both GAAP and SEC regulations mandate disclosure of related party transactions.***

**Regulation S-K**

61.     SEC Regulation S-K (27 CFR § 229.10) requires that annual reports such as those filed by China Techfaith on Form 20-F comply with the other requirements of Regulation S-K "to the extent provided in the forms and rules under [the Exchange] Act."

62.     Reg. S-K at §229.404, Item 404, required, at all times during the Class Period, that the Company "[d]escribe any transaction, since the beginning of the registrant's last fiscal year, or any currently proposed transaction, in which the registrant was or is to be a participant and the

---

Road, Xiuyuan 1st Street, Mobile Phone Industrial Park, Daoyi North Street, Shenbei New District, Shenyang, China to a new location at a certain point of time in 2018.

[28] https://www.qixin.com/company/b2c894ca-aeb8-4ab7-8b79-d6450d3b8316, last viewed on July 15, 2019.

[29] https://www.qixin.com/shareholder/e883a1e6b5b7e9be99/d94dc8de-cb8e-4972-9ef8-1812830b427e, last viewed on July 15, 2019.

[30] https://www.qixin.com/company/39dfe57d-ad71-4ca1-950f-328adc9d2f3e, last viewed on July 15, 2019.

amount involved exceeds $120,000, and in which any related person had or will have a direct or indirect material interest."[31]

63.     Reg. S-K required the disclosure of detailed information concerning related party transactions exceeding $120,000, including the names of the "related person" or entity participating in the transaction, and the amounts of the transaction.

64.     A "related person" is defined by Reg. S-K as including any director or executive officer of the Company, any immediate family member of a director or executive officer of the Company, any immediate family member of any 5% or greater shareholder of the Company, which means any child, stepchild, parent, stepparent, spouse, *sibling*, mother-in-law, father-in-law, son-in-law, daughter-in-law, brother-in-law, or sister-in-law of such shareholder, and any person (other than a tenant or employee) sharing the household of such shareholder.[32]

65.     SEC Regulation S-K defines a transaction, for purposes of related party transactions, includes, but is not limited to, any financial transaction, arrangement or relationship (including any indebtedness or guarantee of indebtedness) or any series of similar transactions, arrangements or relationships. Reg. S-K at §229.404.

66.     Under Item 7.B., Form 20-F requires disclosure of transactions with related parties, including:

"transactions or loans between the company and (a) enterprises that directly or indirectly through one or more intermediaries, control or are controlled by, or are under common control with, the

---

[31]   The dollar amount for required disclosure was $60,000 for Reg. S-K at all times during the Class Period. The $60,000 threshold was increased to $120,000 by the SEC effective January 2007 under Reg. S-K, though not for Reg S-B.

[32]   Deyou and Yiping Ouyang both had training in US GAAP and PRC GAAP. They were each aware that failure to disclose the transactions with Defu and MFox violated GAAP.

company; (b) associates; (c) individuals owning, directly or indirectly, an interest in the voting power of the company that gives them significant influence over the company, and close members of any such individual's family; (d) key management personnel, that is, those persons having authority and responsibility for planning, directing and controlling the activities of the company, including directors and senior management of companies and close members of such individuals' families; and (e) enterprises in which a substantial interest in the voting power is owned, directly or indirectly, by any person described in (c) or (d) or over which such a person is able to exercise significant influence. This includes enterprises owned by directors or major shareholders of the company and enterprises that have a member of key management in common with the company. Close members of an individual's family are those that may be expected to influence, or be influenced by, that person in their dealings with the company. An associate is an unconsolidated enterprise in which the company has a significant influence or which has significant influence over the company. Significant influence over an enterprise is the power to participate in the financial and operating policy decisions of the enterprise but is less than control over those policies. Shareholders beneficially owning a 10% interest in the voting power of the company are presumed to have a significant influence on the company."

67. Under SEC regulations, China Techfaith must disclose

"The nature and extent of any transactions or presently proposed transactions which are material to the company or the related party, or any transactions that are unusual in their nature or conditions, involving goods, services, or tangible or intangible assets, to which the company or any of its parent or subsidiaries was a party.
The amount of outstanding loans (including guarantees of any kind) made by the company, its parent or any of its subsidiaries to or for the benefit of any of the persons listed above. The information given should include the largest amount outstanding during the period covered, the amount outstanding as of the latest practicable date, the nature of the loan and the transaction in which it was incurred, and the interest rate on the loan."
Form 20-F, Item 7.B 1.

**GAAP**

68.     The SEC has the statutory authority to promulgate GAAP for public companies and has delegated that authority to the Financial Accounting Standards Board (the "FASB"). GAAP constitutes those standards recognized by the accounting profession as the conventions, rules, and procedures necessary to define accepted accounting practices at a particular time.

69.     SEC and NASDAQ rules and regulations require that publicly traded companies such as China Techfaith include financial statements that comply with GAAP in their annual and quarterly reports filed with the SEC. Sections 12 and 13 of the Exchange Act; Rule 10-01(d) of Regulation S-X.

70.     SEC Rule 4-01(a) of Regulation S-X states that "[f]inancial statements filed with the Commission which are not prepared in accordance with generally accepted accounting principles will be presumed to be misleading or inaccurate." 17 C.F.R. § 210.4-01(a)(1).

71.     Management is responsible for preparing financial statements that conform to GAAP. The AICPA Professional Standards provide:

> The financial statements are management's responsibility . . . Management is responsible for adopting sound accounting policies and for establishing and maintaining internal control that will, among other things, record, process, summarize, and report transactions (as well as events and conditions) consistent with management's assertions embodied in the financial statements. The entity's transactions and the related assets, liabilities, and equity are within the direct knowledge and control of management. . . . Thus, the fair presentation of financial statements in conformity with generally accepted accounting principles is an implicit and integral part of management's responsibility. PCAOB AU 110.03.
> Within auditing standards, an *arm's length transaction* is defined as a "transaction conducted on such terms and conditions between a willing buyer and a willing seller who are ***unrelated and are acting independently of each other and pursuing their own best interests***."[33] (AU-C 550.10).

---

[33] Whenever text appearing in a quote is bolded and italicized, emphasis has been added.

72.     GAAP Statement of Financial Accounting Standards ("SFAS") requires disclosure of all material transactions between China Techfaith, and related parties. ASC 850-10-50-1. The SEC on recognizes the U.S. Financial Accounting Standards Board (FASB) as the designated private sector standards setter for U.S. public companies. See Release Nos. 33-8221; 34-47743; IC-26028; FR-70. According to professional standards set by the American Institute of Certified Public Accountants, SFAS is <u>the</u> preferred source for determination of GAAP requirements. Failure to follow SFAS is a violation of Rule 203 of the AICPA code of professional conduct.[34]

73.     ASC 850, Related Parties, establishes requirements for disclosure of transactions between a company and related parties, such as officers, directors and their immediate family members. A copy of ASC 850 is attached hereto as Exhibit 6 and is incorporated by reference herein.

74.     Under ASC 850, related parties include:

a. Affiliates of the entity

b. Entities for which investments in their equity securities would be required, absent the election of the fair value option under the Fair Value Option Subsection of Section 825-10-15, to be accounted for by the equity method by the investing entity

c. Trusts for the benefit of employees, such as pension and profit-sharing trusts that are managed by or under the trusteeship of management

d. Principal owners of the entity and members of their immediate families

e. Management of the entity and members of their immediate families

f. Other parties with which the entity may deal if one party controls or can significantly influence the management or operating policies of the other to an extent that one of the transacting parties might be prevented from fully pursuing its own separate interests

g. Other parties that can significantly influence the management or operating policies of the transacting parties or that have an ownership interest in one of the transacting parties and can significantly influence the other to an extent that one or more of the transacting parties might be prevented from fully pursuing its own separate interests. ASC 850-10-20.

75.     Financial statements shall include disclosures of material related party transactions, other than compensation arrangements, expense allowances, and other similar items in the ordinary course of business. However, disclosure of transactions that are eliminated in the preparation of consolidated or combined financial statements is not required in those statements. The disclosures shall include:

a. The nature of the relationship(s) involved

b. A description of the transactions, including transactions to which no amounts or nominal amounts were ascribed, for each of the periods for which income statements are presented, and such other information deemed necessary to an understanding of the effects of the transactions on the financial statements

c. The dollar amounts of transactions for each of the periods for which income statements are presented and the effects of any change in the method of establishing the terms from that used in the preceding period

d. Amounts due from or to related parties as of the date of each balance sheet presented and, if not otherwise apparent, the terms and manner of settlement. ASC 850-10-50-1.

76.     FASB specifically points out that **"[t]ransactions involving related parties cannot be presumed to be carried out on an arm's-length basis, as the requisite conditions of competitive, free-market dealings may not exist.** Representations about transactions with related parties, if made, shall not imply that the related party transactions were consummated on terms equivalent to those that prevail in arm's-length transactions unless such representations can be substantiated." ASC 850-10-50-5. **If the reporting enterprise and one or more other enterprises are under common ownership or management control and the existence of that control could result in operating results or financial position of the reporting enterprise significantly different from those that would have been obtained if the enterprises were autonomous, the nature of the control relationship shall be disclosed even though there are no transactions between the enterprises."** ASC 850-10-50-6.

77.     China Techfaith falsely represented in each of its annual financial statements filed with the SEC that its financial statements were prepared in accordance with GAAP.

78.     Item 10(e) of Regulation S-K (17 CFR §229.10(e)) mandates that issuers disclose to investors whenever they are using non-GAAP financial metrics. Issuers must, among other things, (a) disclose that they are using non-GAAP metrics, (b) disclose the closest analogous GAAP principle, and (c) reconcile the non-GAAP financial metrics to the relevant GAAP metrics. Item 10(e) also prohibits issuers from "us[ing] titles or descriptions of non-GAAP financial measures that are the same as, or confusingly similar to, titles or descriptions used for GAAP financial measures." Accordingly, whenever China Techfaith disclosed financial metrics using GAAP terms, or failed to disclose the use of non-GAAP measures, the markets assumed that the relevant metrics were presented in accordance with GAAP.

79.     Unless a company tells them otherwise, investors reasonably expect that major transactions with related parties are disclosed so that investors can take the related party nature into account when evaluating the substance and quality of the transactions and their impact on the Company. Management self-dealing is always red-flag warning for investors.  .

80.     Furthermore, FASB specifically points out that "if the reporting enterprise and one or more other enterprises are under common ownership or management control and the existence of that control could result in operating results or financial position of the reporting enterprise significantly different from those that would have been obtained if the enterprises were autonomous, **the nature of the control relationship shall be disclosed even though there are no transactions between the enterprises."** ASC 850-10-50-6..

81.     Disclosure of related party transactions is required because without disclosure, investors cannot know the true nature of a transaction and may presume that it was conducted at arm's length. Disclosure of *all* related party transactions is important for investors to determine whether the corporation has subordinated its independent interests to the related party. Disclosure of Defendants' related party transactions would have informed investors that Defendants Defu and Deyou had the ability and intention to dominate and control the company personally and deploy China Techfaith's assets for his personal enrichment to China Techfaith's detriment.

## CHINA TECHFAITH DEFENDANTS' FALSE STATEMENTS

*(i)     **Undisclosed Related Party Transactions in** 2Q2014 Form 6-K*

82.     The Class Period begins on September 2, 2014, when China Techfaith filed with the SEC a Form 6-K, disclosing its financial results for the second quarter ended June 30, 2014 ("2Q2014 Form 6-K"). It states, in relevant parts, that:

> For the second quarter of 2014, TechFaith reported net revenue of US$23.1 million compared to US$26.2 million in the first quarter of 2014. This is in line with the Company's

previously issued guidance for the second quarter, which estimated revenue to be in the range of US$22 million to US$26 million. Revenue for the Company's Original Developed Product, or ODP, business was US$18.4 million, as compared to US$23.3 million in the first quarter of 2014. The 21.3% sequential decline in revenue from the ODP business was mainly due to continuing intensive competition in smartphone markets worldwide. **Revenue in the Company's brand name phone business was US$4.5 million**, as compared to US$2.7 million in the first quarter of 2014. The 64.6% sequential increase in revenue from the brand name phone business was mainly due to increased customer demand for the Company's tailored mobile devices.

83.     The 2Q 2014 Form 6-K also included its income statements for the three and six months ended June 30, 2014, as well as its balance sheet as of that date.  The 2Q 2014 2Q2014 Form 6-K did not state that either financial statement included non-GAAP measures. Accordingly, China Techfaith implicitly represented that the financial statements were presented in accordance with GAAP.  The financial statements in the 2Q 2014 2Q2014 Form 6-K were false and misleading because they (a) conveyed that they were prepared in accordance with GAAP; and yet (b) omitted material related party transactions whose disclosure GAAP mandated, including that (i) Mfox permitted China Techfaith to use Mfox's trademarks, while China TechFaith falsely claimed that it owned the trademarks, and China TechFaith was required to fully and truthfully disclose in the financial statements the terms of such transactions; (ii) China Techfaith was using its personnel and capital to develop Mfox's trademarks; (iii) China Techfaith was using its personnel and capital to support Mfox's operations, including by providing Mfox with offices and the use of China Techfaith personnel; and (iv) China Techfaith had invested US$43 million in building three buildings in Hangzhou and US$8.3 million in building one building in Shenyang all for Mfox's benefit.

84.     2Q2014 Form 6-K was false misleading because China Techfaith Defendants omitted to disclose that the trademarks that were actually owned by Mfox Technology and China Techfaith was essentially developing the goodwill and intangible assets for Mfox. These

transactions fit the requirements of GAAP and Reg S-K as to the duty to disclose related party transactions because Defendant Defu, the then Chariman and CEO of China Techfaith, also owned the majority of Mfox. The transactions were material because China Techfaith's brand name business contributed 19.3% of total revenue for the second quarter of 2014. The transaction was material.

85.    Unless a company tells them otherwise, investors reasonably expect that major transactions with related parties are disclosed so that investors can take the related party nature into account when evaluating the substance and quality of the transactions and their impact on the Company. Management self-dealing is always red-flag warning for investors.  And here, China Techfaith concealed the related party nature of its real estate investment and misleadingly told investors that its purpose was to boost returns.

86.    Furthermore, FASB specifically points out that "if the reporting enterprise and one or more other enterprises are under common ownership or management control and the existence of that control could result in operating results or financial position of the reporting enterprise significantly different from those that would have been obtained if the enterprises were autonomous, **the nature of the control relationship shall be disclosed even though there are no transactions between the enterprises.**" ASC 850-10-50-6.SFAS No. 57 ¶4.

87.    Similarly, Defendants should have disclosed that China Techfaith invested in and developed real estate properties for the benefit of Mfox because the dollar amount involved in the related party transaction was material. Defendant China Techfaith invested US$43 million in the construction of three buildings in Hangzhou and US$8.3 million in the building in Shenyang. The transaction should have been disclosed also pursuant to ASC 850-10-20SFAS No. 57 ¶4.

88.     The disclosure of these related party transactions is required because without disclosure, investors cannot know the true nature of a transaction and may (or perhaps will) presume that it was conducted at arm's length. Disclosure of *all* related party transactions is important for investors to determine whether the corporation has subordinated its independent interests to the related party. FAS No. 57, p.7. Disclosure of Defendants' related party transactions would have informed investors that Defendants Defu and Deyou had the ability to dominate and control the company personally so as to direct its assets to Defendant Defu's personal company in a manner that could be, and was, detrimental to the Company and its shareholders.

*(ii)*     ***Undisclosed Related Party Transactions in the 2014 Annual Report***

89.     On April 28, 2015, Defendant China Techfaith filed its 2014 Annual Report on Form 20-F with the SEC ("2014 Annual Report" or "2014 20-F") stating, in relevant part:

> Our revenues from sales of brand name phones represent sales of mobile phones ***under our brands*** including **QIGI, Tecface, 17FOX, MOBIFOX.** The brand phones are designed by us and manufactured by EMS providers. Our brand name phone sales contributed revenues of US$16.2 million, or 16.7% of our total net revenues, in 2014.
>
> Revenue from sales of brand name phones, represent mobile phone ***under our brands*** including Tecface, QIGI, 17FOX and MOBIFOX.
>
> In 2010, the Group acquired Citylead with its subsidiaries and VIE (the "Citylead Group") and started to sell mobile phones under "QIGI" brand. **The Group also developed *its own brands*, including "Tecface", "17FOX" and "MOBIFOX".**

90.     The highlighted statements were false and misleading because China Techfaith did not own its own brands. Instead, China Techfaith had transferred the brands to Defendants.

91.     The 2014 Annual Report also provided:

> We commenced the construction of buildings and facilities in major cities in China with the primary purpose of developing our own smart phone manufacturing capacity and strengthening our research and development capabilities in handset design. We finished the construction of our first two buildings in Hangzhou in 2010 and the third building in 2013. As we now expect our current buildings and facilities to be sufficient for our own

use, we now expect the buildings and facilities under construction to exceed our own need for research and development and manufacturing facilities. ***We now view the construction of these buildings and facilities as part of our strategy to diversify revenue streams, and expect to lease or potentially sell unused portions of our constructed buildings and facilities to third parties to generate additional revenues***, but we cannot assure you that we will be successful in these revenue-generating attempts. […]

We currently have a real estate project located in each of Hangzhou, Beijing and Shenyang. ***As part of our strategy to expand, we acquired land use rights in these three cities beginning with the acquisition of land use rights in Hangzhou in 2008. …. We also have begun constructing facilities in Shenyang, after acquiring land use rights to a piece of land in November 2011.*** […]

***Although they have not generated little revenue to date, our real estate projects are part of our strategy to diversify our revenue streams***. As of December 31, 2014, we had invested an aggregate of US$62.5 million (RMB388.1 million) in the construction of our buildings and facilities in Hangzhou, US$59.7 million (RMB370.4 million) in the construction of our buildings and facilities in Beijing, and US$29.1 million (RMB180.4 million) in the construction of our buildings and facilities in Shenyang. We believe that our current premises and facilities are more than sufficient to accommodate our existing production capacity needs, and as a result, we intend to lease or sell the unutilized buildings and facilities we construct.

**In November 2011, our subsidiary, 17FOXSY, acquired land use rights to a piece of land comprising 46,715 square meters in Shenyang, China,** *for the establishment of an integrated research and development, sales and distribution center*. In mid-2012, we commenced the Phase I construction of two buildings with an area of 10,270 square meters, which was completed in 2014. As of December 31, 2014, we had invested US$10.1 million (RMB62.9 million) in construction fees in connection with the Phase I construction. Under our current construction plan, there are buildings of approximately 40,966 square meters to be built in Shenyang. The capital expenditure in connection with the facilities in Shenyang is expected to be US$20.0 million over the next three years.

92.    The highlighted statements were false and misleading because China Techfaith did

not establish its real estate practice to diversify its investments but rather to benefit Mfox.

93.    The 2014 20-F also stated that "[d]uring 2012 and 2013, we had no related party

transactions." As to 2014, the 2014 20-F stated that China Techfaith had entered into a 3-year

rental of certain office space in Beijing for $0.2 million/year. The 2014 20-F did not disclose any

additional related party transactions. Further, Further, the 2014 20-F's cover page provided that

China Techfaith had prepared its financial statements under U.S. GAAP.

- 36 -

94.     These statements were false and misleading because the 2014 20-F omitted related-party transactions, including that (i) Mfox permitted China Techfaith to use Mfox's trademarks, while China TechFaith falsely claimed that it owned the trademarks, and China TechFaith was required to fully and truthfully disclose in the financial statements the terms of such transactions; (ii) China Techfaith was using its personnel and capital to develop Mfox's trademarks; (iii) China Techfaith was using its personnel and capital to support Mfox's operations, including by providing Mfox with offices and the use of China Techfaith personnel; and (iv) China Techfaith had invested US$43 million in building three buildings in Hangzhou and US$8.3 million in building one building in Shenyang all for Mfox's benefit.

95.     Defendant Defu signed the 2014 20-F. Defendants Defu and Ouyang likewise certified the 2014 20-F's accuracy pursuant to SOX Section 302.

96.     As part of each annual audit, under Generally Accepted Auditing Standards, the Company's auditor is obligated to inquire, either orally or in writing, of each senior officer and each director as to the existence of any related party transactions with the Company.

97.     In addition, prior to issuing an unqualified or "clean" audit opinion, an auditor will require that a Company's Chief Executive Officer and Chief Financial Officer sign a "management representation letter."  These written representations are mandated as a professional standards requirement under PCAOB AS 2410 and AS No. 18.  The management representation letter will represent to the auditors that the CEO and CFO are not aware of any undisclosed related party transactions, eg.. that all related party transactions are fully disclosed in the footnotes to the financial statements.

98.     PCAOB AU333.05 requires independent auditors to obtain written representations from management, including the CEO and CFO,  as a part of an audit of financial statements

performed in accordance with generally accepted auditing standards, including but not limited to the names of all related parties and transactions with related parties, amounts receivable from or payable to related parties, and support for any assertion that a transaction with a related part was conducted on arm's-length terms.

99.    AU333.08 specifically states that Materiality considerations would not apply to those representations that are not directly related to amounts included in the financial statements, such as amounts relating to related parties.

100.    These representations are contained in what is known as a "management representation letter."[35]  Management representation letters are used to provide information to the auditors about matters that cannot be objectively tested because they depend on management's knowledge, such as management's intentions and the completeness of information provided to the auditor.

101.    Accordingly, Defendants Defu and Deyou knew that they each had an obligation to disclose the related party transactions to the auditors and in the financial statements.

*(iii)*    ***Undisclosed Related Party Transactions in 2015 Annual Report***

102.    On April 29, 2016, Defendant China Techfaith filed its 2015 Annual Report on Form 20-F with the SEC ("2015 Annual Report" or "2015 20-F") stating in relevant part:

> With the acquisition of Citylead in 2010, we began to design our QIGI branded mobile phones and Tecface branded mobile phones. **Leveraging the design capabilities and EMS suppliers from our ODP business, we began to sell mobile phones under the "17FOX" brand in 2012 and added the MOBIFOX brand in 2013.**
> We started our brand name phone sales business in February 2010 with the QIGI brand**. In 2011 we introduced the Tecface brand. In 2012, we began to sell mobile phones under our "17FOX" brand. In 2013, we promoted our new brand "MOBIFOX." We emphasized the brands of our mobile handset products because self-owned branded**

---

[35] The illustrative management representation letter provided by PCAOB under AU333.16 is incorporated herein by reference and can be found at https://pcaobus.org/Standards/Archived/PreReorgStandards/Pages/AU333.aspx.

**products offered a higher profit margin compared with mobile handsets we sold for our ODP business. We disposed the QIGI brand in 2015 due to declining revenues.**

103.    The highlighted statements were false and misleading because China Techfaith did

not own its own brands. Instead, China Techfaith had transferred the brands to Defendants.

We commenced the construction of buildings and facilities in major cities in China **with the primary purpose of developing our own smart phone manufacturing capacity and strengthening our research and development capabilities in handset design**. As we now expect our current buildings and facilities to be sufficient for our own use, we now expect the buildings and facilities under construction to exceed our own need for research and development and manufacturing facilities**. We now view the construction of these buildings and facilities as part of our strategy to diversify revenue streams, and expect to lease or potentially sell unused portions of our constructed buildings and facilities to third parties to generate additional revenues,** but we cannot assure you that we will be successful in these revenue-generating attempts. **We commenced construction projects in Hangzhou in 2008, finished the construction of the first two buildings in 2010 and the third building in 2013. We began to prepare the construction of another four buildings in Hangzhou in 2015.** In addition, we commenced construction projects in Beijing in 2012. In 2015, we completed the construction of all the 16 buildings of the phrase I of our technological park in Beijing and began to apply for relevant government inspections, and commenced the construction of 6 buildings of its phase II project. **Moreover, we commenced construction projects in Shenyang in 2012, and we finished the construction of two buildings in Shenyang in 2014.** In 2013, 2014 and 2015, in connection with our construction projects, we incurred a total capital expenditure of US$10.5 million, US$58.6 million and US$147.8 million, respectively. We expect to continue to incur significant capital expenditures in relation to these construction projects, and expect to incur an additional total capital expenditures of US$40 million from 2016 to 2018. We also own an office building in Beijing, which we rented out in 2013, 2014 and 2015, and in 2014 we began to rent out portions our buildings in Shenyang and Hangzhou. In 2013, 2014 and 2015 we generated rental income from real estate of US$1.2 million, US$2.6 million and US$4.4 million, respectively.

**Our client in Shenyang Tech Park is an anchor tenant leasing the whole park for its electronics manufacturing business and as workers dormitory. Our tenants in Hangzhou Tech Park are mostly Small Medium Enterprises in various industries** and tenants in Beijing Jiu Xian Qiao are mostly Small Medium Enterprises focus on technology sector.

**As part of our expansion strategy, we acquired land use rights and began constructing buildings and facilities in Hangzhou, Beijing and Shenyang of China. These buildings and facilities are designed for research and development purposes as well as for establishing internal manufacturing capabilities. Since then, we have shifted our strategy to use the construction of these buildings and facilities to help diversify**

**revenue streams—as we now believe that our current premises and facilities are more than sufficient to accommodate our existing production capacity needs, we currently plan to lease or sell the unused portions of these buildings and facilities once construction stage is completed. Thus, our real estate portfolio now forms part of our strategy to diversify revenue streams.**

104.   The highlighted statements are false and misleading because China Techfaith did not establish its real estate practice to diversify its investments but rather to benefit Mfox.

105.   Under Item 7-B, the 2015 20-F disclosed three related party transactions, two of which did not involve Mfox: (i) an office lease for $0.2 million/year; and (ii) the sale of one of China Techfaith's VIEs. The third, though it involved Mfox, was an anodyne sale of cell phones to Mfox for $2.1 million. Further, the 2015 20-F's cover page provided that China Techfaith had prepared its financial statements under U.S. GAAP. These statements were false and misleading because China Techfaith engaged in numerous other related-party transactions, including that (i) Mfox permitted China Techfaith to use Mfox's trademarks, while China TechFaith falsely claimed that it owned the trademarks, and China TechFaith was required to fully and truthfully disclose in the financial statements the terms of such transactions; (ii) China Techfaith was using its personnel and capital to develop Mfox's trademarks; (iii) China Techfaith was using its personnel and capital to support Mfox's operations, including by providing Mfox with offices and the use of China Techfaith personnel; and (iv) China Techfaith had invested US$43 million in building three buildings in Hangzhou and US$8.3 million in building one building in Shenyang all for Mfox's benefit.

106.   Defendant Deyou signed the 2015 20-F. Defendants Deyou and Ouyang likewise certified the 2015 20-F's accuracy pursuant to SOX Section 302.

### (v) Undisclosed Related Party Transactions in 2016 Annual Report

107.   On April 27, 2017, Defendant China Techfaith filed its 2017 Annual Report on Form 20-F with the SEC ("2016 Annual Report" or "2016 20-F") stating, in relevant part:

> With the acquisition of Citylead in 2010, we began to design our QIGI branded mobile phones and Tecface branded mobile phones. **Leveraging the design capabilities and EMS suppliers from our ODP business, we began to sell mobile phones under the "17FOX" brand in 2012 and added the MOBIFOX brand in 2013.**
>
> We started our brand name phone sales business in February 2010 with the QIGI brand. In 2011 we introduced the Tecface brand. **In 2012, we began to sell mobile phones under our "17FOX" brand. In 2013, we promoted our new brand "MOBIFOX." We emphasized the brands of our mobile handset products because self-owned branded products offered a higher profit margin compared with mobile handsets we sold for our ODP business.** We disposed of the QIGI brand in 2015 due to declining revenues.

108.   The highlighted statements were false and misleading because China Techfaith did not own its own brands. Instead, China Techfaith had transferred the brands to Defendants.

> **We commenced the construction of buildings and facilities in major cities in China with the primary purpose of developing our own smart phone manufacturing capacity based on our business growth, space constraints, and customer demand, in order to further strengthen our sales, marketing, research and development capabilities in handset design. After declines in the overall market for our handsets, our existing buildings and facilities are not only sufficient for our own use but also have excess space, allowing us to pursue a strategy to monetize our existing buildings and facilities and those under construction. We now believe the construction of these buildings and facilities as part of our long term strategy to diversify revenue streams, and expect to lease or potentially sell unused portions of our constructed buildings and facilities to third parties to generate additional revenues, but we cannot assure you that we will be successful in these attempts given volatility in the real estate market, ability of potential buyers to secure required financing and attractiveness of our facilities to potential tenants for leasing.**
>
> **Our tenant in Shenyang Tech Park is an anchor tenant leasing the whole park for its electronics manufacturing business and as a workers ' dormitory. Our tenants in Hangzhou Tech Park are mostly Small-to-Medium Sized Enterprises in various industries** and while tenants in Beijing Jiu Xian Qiao are mostly Small-to-Medium Sized Enterprises focused on the technology sector.
>
> **As part of our expansion strategy, we acquired land use rights and began constructing buildings and facilities in Hangzhou, Beijing and Shenyang of China. These buildings and facilities are designed for research and development purposes as well as for**

**establishing internal manufacturing capabilities. Since then, we have shifted our strategy to use the construction of these buildings and facilities to diversify our business. We believe that our current premises and facilities are more than sufficient to accommodate our existing production capacity needs and we have engaged in activities to lease or sell the unused portions of these buildings and facilities as construction is completed. Thus, our real estate portfolio now forms part of our strategy to diversify revenue streams.**

109.     The highlighted statements are false and misleading because China Techfaith did not establish its real estate practice to diversify its investments but rather to benefit Mfox.

110.     Under Item 7-B, the 2015 20-F disclosed three related party transactions, two of which did not involve Mfox: (i) an office lease for $0.2 million/year; and (ii) a temporary change in China Techfaith's corporate structure, through which one of China Techfaith's subsidiaries temporarily became a VIE. The third, though it involved Mfox, was an anodyne purchase of raw materisl from Mfox of $2.8 million over two years and sale of cell phones to Mfox for $5.5 million over two years. Further, the 2016 20-F's cover page provided that China Techfaith had prepared its financial statements under U.S. GAAP. These statements were false and misleading because China Techfaith engaged in numerous other related-party transactions, including that (i) Mfox permitted China Techfaith to use Mfox's trademarks, while China TechFaith falsely claimed that it owned the trademarks, and China TechFaith was required to fully and truthfully disclose in the financial statements the terms of such transactions; (ii) China Techfaith was using its personnel and capital to develop Mfox's trademarks; (iii) China Techfaith was using its personnel and capital to support Mfox's operations, including by providing Mfox with offices and the use of China Techfaith personnel; and (iv) China Techfaith had invested US$43 million in building three buildings in Hangzhou and US$8.3 million in building one building in Shenyang all for Mfox's benefit.

111.    Defendant Deyou signed the 2016 20-F. Defendants Deyou and Ouyang likewise certified the 2016 20-F's accuracy pursuant to SOX Section 302.

### (vi) False and Misleading statement in Schedule 13 D filed on January 18, 2018.

112.    On January 18, 2018, before markets opened, Defendant Deyou filed a Schedule 13D to advise that he purportedly received approximately 97.7% of his brother Defendant Defu's shares. Defendant Defu also filed a Schedule 13G/A to disclose the same transaction. The Schedules 13D provided in relevant part:

> **Item 4. Purpose of Transaction.**
>
> Mr. Defu Dong founded the Issuer and has been its chief executive officer until May 2015. Mr. Deyou Dong joined the Issuer in 2007. He soon became to assume leading positions, and has been serving as the Issuer's chief executive officer since May 2015.
>
> Mr. Deyou Dong is Mr. Defu Dong's brother. **For the purpose of family asset planning and to align the interests of the Issuer's shareholders and the management,** Mr. Deyou Dong and Mr. Defu Dong effected the transfer described in this Statement.

113.    The emphasized statement above is false and misleading because as alleged above, the purpose of the stock transfer was not asset planning or aligning Defu and Deyou's interests with China Techfaith, but instead to facilitate China Techfaith's corporate looting for Defendants Defu and Deyou's benefit.

114.    Nevertheless, buoyed by the announcement that China Techfaith's controlling shareholder's interests would be fully aligned with other shareholders', China Techfaith's stock price rose from $2.52/ADS to $3.08/ADS, up 22.22%, on January 18, 2018.

### (vii) Undisclosed Related Party Transactions in 2017 Annual Report

115.    On April 27, 2018, Defendant China Techfaith filed its 2017 Annual Report on Form 20-F with the SEC ("2017 Annual Report") stating in relevant part:

> We started our brand name phone sales business in February 2010 with the QIGI brand. **Thereafter, we added Tecface, 17FOX and MOBIFOX brands into our brand matrix. We emphasized the brands of our mobile handset products because self-owned branded products offered a higher profit margin compared with mobile handsets we sold for our ODP business.**
>
> We also sell branded name phones under our brands including Tecface, 17FOX and MOBIFOX to our customers.
>
> **Revenue from sales of brand name phones, represent mobile phone under our brands including Tecface, QIGI, 17FOX and MOBIFOX.** Our brand phones are designed by us and manufactured by EMS providers.

116.    The highlighted statements were false and misleading because China Techfaith did not own its own brands. Instead, China Techfaith had transferred the brands to Defendants.

> We began constructing our first technological park, i.e., buildings and **facilities intended for research and development, as well as manufacturing purposes**, in Hangzhou, China in 2008. Since then, we expanded our number of construction projects to include similar technological parks in Beijing, China, in 2012, which were sold in 2017, and in Shenyang, China, in 2013. We plan to further expand our presence in the above and other cities as suitable opportunities arise.
>
> We have so far disposed of the technological park and the 6-floor building in Beijing. **We will continue to own and manage our real estate portfolio consisting of three completed buildings in Hangzhou, two completed buildings in Shenyang and a variety of buildings in various stages of construction.**
>
> **Our tenant in Shenyang Tech Park is an anchor tenant leasing the whole park for its electronics manufacturing business and as a workers' dormitory, while our tenants in Hangzhou Tech Park are mostly Small-to-Medium Sized Enterprises in various industries.**
>
> As part of our expansion strategy, we acquired land use rights and began constructing buildings and facilities in Hangzhou, Beijing and Shenyang of China. These buildings and facilities were originally designed for research and development purposes as well as for establishing internal manufacturing capabilities. Since then, we have shifted our strategy to use the construction of these buildings and facilities to diversify our business. We have engaged in activities to lease or sell the unused portions of these buildings and facilities as

construction is completed. Thus, our real estate portfolio now forms part of our strategy to diversify revenue streams.

We have completed the construction of three buildings with a total area of 43,398 square meters and they have been all rented out. In addition, we are constructing another four buildings in Hangzhou. **As of December 31, 2017, we had invested approximately US$147.3 million in the construction of our facilities in Hangzhou. The capital expenditure in connection with the facilities in Hangzhou is expected to be US$11.3 million in aggregate in the next three years.**

As part of our expansion strategy, we acquired land use rights and began constructing buildings and facilities in Hangzhou, Beijing and Shenyang of China. These buildings and facilities are designed for research and development purposes as well as for establishing internal manufacturing capabilities. Since then, we have shifted our strategy to use the construction of these buildings and facilities to help diversify our business. Our current premises and facilities are more than sufficient to accommodate our existing production needs, we currently lease or sell the unused portions of these buildings, construction in progress and facilities. Thus, our real estate portfolio has formed part of our strategy to diversify our revenue.

As of December 31, 2017, our buildings available for lease, including two in Shenyang and three in Hangzhou, of about 53,000 square meters in total, of which 51,344 square meters have been leased out.

**Revenues from continuing real estate business decreased by 4.2% from US$3.5 million in 2015 to US$3.3 million in 2016. The decrease was mainly due to the change of exchange rate. The continuing real estate business includes the rental income of two buildings in Shenyang and three buildings in Hangzhou.**

Net cash used in investing activities was US$25.2 million in 2017, which mainly resulted from investment of $40.8 million in Hangzhou and Shenyang projects and a loan of $51.8 million to a third party offset by $65.1 million received from the sale of a subsidiary. We began to prepare the construction of another four buildings in Hangzhou in 2015.

**We expect that our capital expenditure from 2018 to 2020 will amount to approximately US$19.9 million, which will primarily relate to the construction of office buildings in Hangzhou and Shenyang.** The capital expenditure in connection with the facilities in Hangzhou for four buildings is expected to be US$11.3 million over the next three years. The capital expenditure in connection with the facilities in Shenyang is expected to be US$8.6 million in aggregate in the next three years. We currently plan to fund these expenditures with our cash, cash equivalents, short-term investments and anticipated cash flow generated from our operating activities, as well as long-term loans.

117.    The highlighted statements are false and misleading because China Techfaith did not establish its real estate practice to diversify its investments but rather to benefit Mfox.

118.    The 2017 20-F further provided:

In December 2017, the Group entered into an agreement with an ***EMS factory of the Group, an unrelated third party***, to provide a [$53.8 million] (RMB 350 million) loan to fund its capital demand of production. This loan is for a period of twelve months, at an interest rate of 4.35% per year. The EMS factory agreed to provide its machine and equipment as the collateral for this loan. In addition, the shareholder of EMS factory agreed to provide the equity as collateral to the Group. The EMS factory agreed to repay the loan in four installments, or to repay about [$13.5 million] (RMB 87.5 million) at the end of each quarter in 2018 and early repayment of the loan is acceptable. The EMS factory repaid about [$18.8 million] (RMB 122 million) by March 31, 2018.

119.    Defendants' statements were false because the $53.8 million loan was not to an unrelated third party, ***but to related party Mfox*** ("Mfox Loan").

120.    Under Item 7-B, the 2016 20-F disclosed three two related party transactions, one of which, a temporary change in China Techfaith's corporate structure, through which one of China Techfaith's subsidiaries temporarily became a VIE, did not involve Mfox. As to Mfox, China Techfaith disclosed only purchases of raw materials for $2.7 million over two years and sales of cell phones for $3.8 million over two years. Further, the 2016 20-F's cover page provided that China Techfaith had prepared its financial statements under U.S. GAAP. These statements were false and misleading because China Techfaith engaged in numerous other related-party transactions, including that (i) Mfox permitted China Techfaith to use Mfox's trademarks, while China TechFaith falsely claimed that it owned the trademarks, and China TechFaith was required to fully and truthfully disclose in the financial statements the terms of such transactions; (ii) China Techfaith was using its personnel and capital to develop Mfox's trademarks; (iii) China Techfaith was using its personnel and capital to support Mfox's operations, including by providing Mfox with offices and the use of China Techfaith personnel; (iv) China Techfaith had invested US$43

million in building three buildings in Hangzhou and US$8.3 million in building one building in Shenyang all for Mfox's benefit; and (v) China Techfaith lent Mfox $53.8 million.

121.    Defendant Deyou signed the 2017 20-F. Defendants Deyou and Ouyang likewise certified the 2017 20-F's accuracy pursuant to SOX Section 302.

## LOSS CAUSATION

122.    Defendant's siphoning of China Techfaith's resources for their own benefit throughout the Class Period led to unexpectedly poor results, causing a substantial decline the price of China TechFaith stock.

123.    On September 19, 2014 when China Techfaith filed its 2Q2014 Form 6-K disclosing negative financial results, its stock price dropped 4.41% from $6.8/ADS to $6.5/ADS, and another 3.08% to $6.3/ADS during the next trading day on September 22, 2014, further damaging investors.   This share price drop occurred because of negative financial results caused by the China TechFaith Defendants' fraudulent undisclosed related party transactions.

124.    On March 12, 2015 before the market was open, Defendants issued a Form 6-K, reporting the Company's terrible performance in unaudited financial results for the fourth quarter and the full year ended December 31, 2014, quoting "the impact of a decline in revenue from the Company's gaming business and its branded phone business" as the reason for the decline of the total revenue of 2014. China Techfaith's stock price dropped fell from $5.1/ADS to $4.95/ADS, or 2.94%, damaging investors.  This share price drop occurred because of negative financial results caused by the China TechFaith Defendants' fraudulent undisclosed related party transactions.

125.    On April 30, 2015, due to China Techfaith's terrible performance for the year of 2015, its stock price dropped fell from $5.75/ADS to $5.45/ADS, or 5.22%, damaging investors. This share price drop occurred because of negative financial results caused by the China TechFaith Defendants' fraudulent undisclosed related party transactions.

126.     On September 24, 2015 before the market was open, Defendants announced China Techfaith's unaudited financial results for the second quarter ended June 30, 2015. At the earnings

call at 8 am ET, Defendant Deyou cited "significant challenges for the foreseeable future due to shorter product lifecycles, high levels of competition and continued cost pressure" as the reason for China Techfaith's business decline. He also for the first time disclose that the Company was starting to evaluate strategic options around our mobile business, which may or may not ultimately result in the sale of our mobile business. He also said that the Company would continue to focus on our growing real estate portfolio and expect this to be a major catalyst to unlock value for the Company and shareholders going forward. China Techfaith's stock price dropped fell from $4.1/ADS to $3.05ADS, or 25.61%, damaging investors. This share price drop occurred because of negative financial results caused by the China TechFaith Defendants' fraudulent undisclosed related party transactions.

127.    On September 25, 2015 China Techfaith issued a Form 6-K, reporting the disappointing unaudited financial results for the second quarter ended June 30, 2015. From September 25, 2015 to September 29, 2015, China Techfaith's stock price continued to drop by 8.20%, 1.79%,5.45% day by day, damaging investors. This share price drop occurred because of negative financial results caused by the China TechFaith Defendants' fraudulent undisclosed related party transactions.

128.    On November 11, 2015 before the market was open, Defendants announced China Techfaith's financial results for the third quarter ended September 30, 2015. At the earnings call at 8 am ET, Defendant Deyou cited "further decline of our mobile business and slow transmission to 4G platform" as the reason for the major decrease in revenue. That day, China Techfaith's stock price fell from $3.8/ADS to $3.55ADS, or 6.58%, damaging investors. During the next trading day on November 27, 2015, China Techfaith's stock price fell another 1.41% from $3.55ADS to $3.5/ADS , further damaging investors.  This share price drop occurred because of negative financial results caused by the China TechFaith Defendants' fraudulent undisclosed related party transactions.

129.    February 12, 2016, before the market was open, Defendants issued a Form 6-K, disclosing that  it will change the ratio of its American Depositary Shares ("ADSs") to ordinary shares, par value US$0.01 per share ("Shares") from one (1) ADS to fifteen (15) ordinary shares

to one (1) ADS to seventy-five (75) ordinary shares (the "Ratio Change"), effective on March 1, 2016. This is a reflection of China Techfaith's stock price had been struggling against being a penny stock and investors' lack of confidence in China Techfaith's deteriorating business. This disclosure caused  China Techfaith's stock price to fall from $3.55/ADS to $2.95ADS, or 16.90%, damaging investors.

130.    Before the 2016 Annual Report was issued, Defendants issued a Form 6-K on April 13, 2017 before the market was open, reporting the Company's terrible performance for the financial results for the fourth quarter of 2015 and the full year of 2015. China Techfaith's stock price dropped fell from $2.79/ADS to $2.41/ADS, or 13.62%, damaging investors. This share price drop occurred because of negative financial results caused by the China TechFaith Defendants' fraudulent undisclosed related party transactions.

131.    On August 23, 2017, China Techfaith announced  its disappointing unaudited condensed financial results for the first half period ended June 30, 2017. Defendants cited the "softness in the overall China handset market" as the reason for China Techfaith's revenue decline. This disclosure caused  China Techfaith's stock price to fall from $2.68/ADS to $2.29ADS, or 14.55%, damaging investors.   This share price drop occurred because of negative financial results caused by the China TechFaith Defendants' fraudulent undisclosed related party transactions.

132.

133.    On December 20, 2018, Defendant China Techfaith filed with the SEC a Form 6-K, revealing that in the first half of 2018, it had had to write down bad debt expenses of approximately US$28.7 in connection with the Mfox Loan. "[a]lthough the Company was able to collect, $20.7 million of the above mentioned short-term loan through the reporting date, the Company determined that the provision was necessary due to the default and the current credit condition of the counterparty."

134.     This belated statement is six months late after the end of the first half of 2018. When Yingbai Technology defaulted in the first half of 2018 and failed to make any of the installments, Defendants should have immediately disclosed the default given that one single

installment nearly equaled the total revenues of US$13.6 million for the first half of 2018. The failure to repay any installment would paralyze Defendant China Techfaith's operation and severely hurt the Company's financial results.

135. One of the risks of a company's extending deals to related parties is that the company will not be willing or able to enforce its rights against the related parties. This risk materialized when China Techfaith was unable to, or chose not to,  force Yingbai Technology to timely repay the $53.794 million and interest they owed to China Techfaith.

136. This further shows that Defendants never intended to get back such loaned fund of more than China Techfaith's entire 2017 annual total revenue. Instead, they just conveniently wrote down the loan as a bad debt at the end of the loan term, which successfully achieved their premeditated scheme of funneling the Company's fund to finance Defendant Defu's privately-owned company.

137. Defendant Deyou and Ouyang signed a knowingly false management representation letter to Auditor Friedman prior to issuance of the financial statements in 2017 annual report, otherwise the auditor would have insisted that China TechFaith disclose the related party transactions set forth above.

138. Included as exhibits to 2017 annual report filed with the SEC on form 10-KSB during the Class Period were certifications of Defendants Defu and Ouyang, pursuant to Section 302 of the Sarbanes-Oxley Act of 2002 ("Sarbanes-Oxley") and each of the Sarbanes-Oxley certifications were knowingly false for the same reasons discussed  above.

139. Defendants' December 20, 2018 disclosure shocked the market, as the value of China Techfaith ADS plummeted over 35.5% or $0.59 per ADS from its previous closing price to close at $1.07 per ADS on December 20, 2018. In the next four trade days, China Techfaith's ADS price continue to plunge and damage investors. By December 27, 2018, China Techfaith's ADS

value was slashed by more than half and closed at a price 51% lower than the trade day before the corrective disclosure was made. An unexpected holiday surprise to innocent investors, too bitter to swallow.   This share price decline ocurred because of negative financial results caused by the China TechFaith Defendants' fraudulent undisclosed related party transactions.

### ADDITIONAL ALLEGATIONS SUPPORTING SCIENTER

140.   Since the Form 6-K filed on December 20, 2018, Defendants' misconduct continued to damage the value of China Techfaith shares, hurting investors:

a.   The Company failed to file the Company's 2018 annual report in four months after the end of 2018, resulting in NASDAQ's issuance of a non-compliance warning in May 2019. As of the date this Amended Complaint is filed, Defendants still have not cured the non-compliance;

b.   Also in May 2019, the Company's Audit Committee dismissed Friedman LLP ("Friedman"), a well-known mid-size accounting firm that has an established reputation for conducting auditing for public companies, as China Techfaith's independent auditor and handpicked Wei, Wei & Co., LLP as its new independent auditor, a no-name father-and-son tax shop based in Flushing, New York that raises suspicions as to the accuracy of the Company's financial statements;

c.   In June 2019, NASDAQ warned Defendants of the Company's non-compliance with the minimum bid price requirement pursuant to Nasdaq Listing Rules because the bid price of the Company's ADSs closed below US$1 per share for the last 30 consecutive business days, which would result in delisting if it could not regain compliance. As of the date of this Amended Complaint, the Company's stock price has never reached over US$0.60 per ADS.

d.  In July 2019, NASDAQ issued Defendants another warning notice of China Techfaith's non-compliance with NASDAQ Global Market's requirement of maintaining a minimum market value of publicly held shares of $5,000,000. China Techfaith will be delisted if it cannot regain compliance on or before December 26, 2019.

## AUDITOR LIABILITY AUDITOR LIABILITY

### a.  The PCAOB Standards applicable to Auditor Defendants' audit work

141.  The PCAOB Standards that the Auditor Defendants falsely claimed to have followed require that the auditor exercise "professional skepticism" throughout the audit. PCAOB AS 1015.07. Auditors fail to exercise professional skepticism if they "assume[] [management's] unquestioned honesty." Rather, "**the auditor should not be satisfied with less than persuasive evidence because of a belief that management is honest**." AS1015.09.

142.  The auditor should devise procedures that give reasonable assurances that the financial statements are free of material misstatements – including undisclosed related-party transactions. PCAOB Standards specifically identify a small number of questions the auditor should ask of management, including identifying related parties and related party transactions and identifying any related party transactions which were not properly vetted or approved or for which the company made exceptions to its policies. AS 2410.05. But the auditing standards also demand that auditors identify ***others*** in the company who would have knowledge of related parties and related party transactions – including those responsible for initiating, processing, or recording transactions with potential related parties, their supervisors, or human resources personnel. AS 2410.06. Notably, auditing standards demand that the auditor attempt to identify persons who would know of related parties or transactions that management did not disclose to the auditor. AS

2410.07 c. Thus, the auditor must make efforts to find others at the company to test the completeness of management's representations concerning related parties and transactions.

143.    Further, these inquiries, though necessary, are not sufficient, as mere inquiries are never sufficient to lower the risk of material misstatements to a sufficiently low level. AS 2410.11 n.12. Rather, the auditor must use the information it learned from these inquiries to design tests to identify, among other things, any related parties or transactions which management has not identified. AS 2410.11.

144.    In attempting to determine undisclosed related parties and related party transactions, the auditor should examine unusual transactions. AS 2410.11 – Note & AS2410.14 n. 15.

145.    Finally, in determining these procedures, the auditor should consider public information about the company. AS No. 9.7.

**b.    The Auditor Defendants Violated PCAOB Standards**

146.    In the 2014 20-F, Deloitte published an audit report, which provided:

TO THE BOARD OF DIRECTORS AND SHAREHOLDERS OF
CHINA TECHFAITH WIRELESS COMMUNICATION TECHNOLOGY LIMITED
We have audited the accompanying consolidated balance sheets of China Techfaith
Wireless Communication Technology Limited, its subsidiaries and its variable interest
entity (collectively the "Group") as of December 31, 2013 and 2014, and the related
consolidated statements of comprehensive income (loss), changes in equity, and cash
flows for each of the three years in the period ended December 31, 2014. Our audits also
included the financial statement schedule (Schedule I). These financial statements and
financial statement schedule are the responsibility of the Group's management. Our
responsibility is to express an opinion on the financial statements and financial statement
schedule based on our audits.
***We conducted our audits in accordance with the standards of the Public Company
Accounting Oversight Board (United States).*** Those standards require that we plan and
perform the audit to obtain reasonable assurance about whether the financial statements
are free of material misstatement. An audit includes examining, on a test basis, evidence
supporting the amounts and disclosures in the financial statements. An audit also includes
assessing the accounting principles used and significant estimates made by management,

as well as evaluating the overall financial statement presentation. We believe that our audits provide a reasonable basis for our opinion.

***In our opinion, such consolidated financial statements present fairly, in all material respects, the financial position of the Group as of December 31, 2014 and 2013, and the results of its operations and its cash flows for each of the three years in the period ended December 31, 2014, in conformity with accounting principles generally accepted in the United States of America.*** Also, in our opinion, such financial statement schedule, when considered in relation to the basic consolidated financial statements taken as a whole, present fairly, in all material respects, the information set forth therein.

We have also audited, in accordance with the standards of the Public Company Accounting Oversight Board (United States), the Group's internal control over financial reporting as of December 31, 2014, based on criteria established in Internal Control — Integrated Framework (2013) issued by the Committee of Sponsoring Organizations of the Treadway Commission and our report dated April 28, 2015 expressed an unqualified opinion on the Group's internal control over financial reporting.

/s/ Deloitte Touche Tohmatsu Certified Public Accountants LLP

Beijing, the People's Republic of China

April 28, 2015

147.    Deloitte's statement was false and misleading because, as further set out below, (a) Deloitte's audit deviated from PCAOB Standards, and (b) Deloitte subjectively disbelieved and/or did not have a sufficient basis to state that China Techfaith's financial statements were presented in accordance with GAAP.

148.    PCAOB Standards mandated that Deloitte conduct inquiries from non-managerial employees to identify undisclosed related parties or undisclosed related party transactions. China Techfaith was no corporate giant with intricate operations that were difficult to understand. Instead, as of December 31, 2014, it only had 225 employees. As set out above, China Techfaith's employees told Plaintiffs that internally employees refer to themselves as part of the Mfox Conglomerate. These employees told Plaintiffs that China Techfaith's business was actually moved to Mfox in 2012. Moreover, China Techfaith and Mfox shared offices. Accordingly, had Deloitte conducted the inquiries of employees required by AS 2410.06, Deloitte would have

discovered that Mfox was a related party and that the host of China Techfaith transactions with Mfox were related-party transactions.

149.    Further, China Techfaith was a mobile phone manufacturer. Yet in 2013 and 2014, it entered the real estate business. Had Deloitte examined China Techfaith's unusual real estate transactions, Deloitte would have determined that the Company entered into these transactions to benefit Mfox.

150.    Moreover, China Techfaith stressed the importance of its own brand names to China Techfaith's performance. For example, China Techfaith stated in its 2014 Annual Report: "We emphasize the brands of our mobile handset products because self-owned branded products offered a higher profit margin compared with mobile handsets we sold for our ODP business." Yet far from moving into the branded products marketplace, China Techfaith had apparently moved out of it:

|  | 2012 | 2013 | 2014 |
|---|---|---|---|
| Net revenues: |  |  |  |
| ODP | 57,803 | 79,661 | 79,820 |
| **Brand name phone sales** | **50,266** | **32,203** | **16,188** |
| Game | 29,594 | 7,643 | 660 |

151.    A simple search at the Trademark Office of the State Administration for Market Regulation of China, the sole government authority responsible for the registration and administration of trademarks in China, show that the trademark MOBIFOX was registered by

Mfox Technology in 2015, and a subsidiary of Mfox Technology applied to register the trademark 17FOX in 2012.

152.    Thus, had Deloitte conducted even these minimal inquiries, it would have determined that Mfox was siphoning off China Techfaith's most valuable business lines.

153.    Further, an asset that is not owned or controlled by an entity should not be included in an entity's financial statements because it is not representationally faithful. Or, if such asset is included in the entity's financial statements, disclosure of its lack of ownership should be made. See FASB Statement of Financial Concepts No. 5.

154.    Here, China Techfaith's financial statements should have disclaimed ownership of its own brands because Mfox owned them instead.

155.    In the 2015 20-F, Friedman published an audit report, which provided:

REPORT OF INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM
To the Board of Directors and Stockholders
China Techfaith Wireless Communication Technology Limited
We have audited the accompanying consolidated balance sheet of China Techfaith Wireless Communication Technology Limited and Subsidiaries (collectively, the "Company") as of December 31, 2015, and the related consolidated statements of operations and comprehensive income (loss), changes in equity, and cash flows for the year then ended. The Company's management is responsible for these consolidated financial statements. Our responsibility is to express an opinion on these consolidated financial statements based on our audit.
***We conducted our audit in accordance with the standards of the Public Company Accounting Oversight Board (United States).*** Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement. The Company is not required to have, nor were we engaged to perform, an audit of its internal control over financial reporting. Our audit included consideration of internal control over financial reporting as a basis for designing audit procedures that are appropriate in the circumstances, but not for the purpose of expressing an opinion on the effectiveness of the Company's internal control over financial reporting. Accordingly, we express no such opinion. An audit also includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements, assessing the accounting principles used and significant estimates made by management, as well as evaluating the overall financial statement presentation. We believe that our audit provides a reasonable basis for our opinion.

*In our opinion, the consolidated financial statements referred to above present fairly, in all material respects, the financial position of the Company as of December 31, 2015, and the results of its operations and its cash flows for the year then ended, in conformity with accounting principles generally accepted in the United States of America.*
/s/ Friedman LLP
April 29, 2016

156.    Friedman's statement was false and misleading because, as further set out below, (a) Friedman's audit deviated from PCAOB Standards, and (b) Friedman subjectively disbelieved and/or did not have a sufficient basis to state that China Techfaith's financial statements were presented in accordance with GAAP.

157.    PCAOB Standards mandated that Friedman conduct inquiries from non-managerial employees to identify undisclosed related parties or transactions. The 2015 Annual Report disclosed that Mfox was a related party. No reasonable auditor would have failed to determine that China Techfaith had numerous related-party transactions beyond those disclosed as related party transactions in its 2015 Annual Report. As of December 31, 2015, China Techfaith was down to 135 employees. As set out above, China Techfaith's employees told Plaintiffs that internally employees refer to themselves as part of the Mfox Conglomerate. These employees told Plaintiffs that China Techfaith's business was actually moved to Mfox in 2012. Moreover, China Techfaith and Mfox shared offices. Accordingly, had Friedman conducted the inquiries of employees required by AS 2410.06 or reviewed public information as required by AS No. 9.7., Friedman would have discovered that Mfox was a related party and that the host of China Techfaith transactions with Mfox were related-party transactions.

158.    Further, China Techfaith was a mobile phone manufacturer. Yet in 2013 and 2014, it entered the real estate business. Had Friedman examined China Techfaith's unusual real estate transactions, Friedman would have determined that these transactions existed to benefit Mfox.

- 57 -

159.     Moreover, China Techfaith stressed the importance of its own brand names to China Techfaith's performance. For example, China Techfaith stated in its 2015 Annual Report: "We emphasized the brands of our mobile handset products because self-owned branded products offered a higher profit margin compared with mobile handsets we sold for our ODP business." Yet far from moving into the branded products marketplace, by 2015, China Techfaith's branded products sales had fallen so low that China Techfaith stopped disclosing brand name phone sales separately.

160.     A simple search at the Trademark Office of the State Administration for Market Regulation of China, the sole government authority responsible for the registration and administration of trademarks in China, show that the trademark MOBIFOX was registered by Mfox Technology in 2015, and a subsidiary of Mfox Technology applied to register the trademark 17FOX in 2012.

161.     Thus, had Friedman conducted even these minimal inquiries, it would have determined that Mfox was siphoning off China Techfaith's most valuable business lines.

162.     Further, an asset that is not owned or controlled by an entity should not be included in an entity's financial statements because it is not representationally faithful. Or, if such asset is included in the entity's financial statements, disclosure of its lack of ownership should be made. See FASB Statement of Financial Concepts No. 5.

163.     Here, China Techfaith's financial statements should have disclaimed ownership of its own brands because Mfox owned them instead.

164.     In the 2016 20-F, Friedman published an audit report, which provided:

**REPORT OF INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM**
To the Board of Directors and Stockholders of
China Techfaith Wireless Communication Technology Limited

We have audited the accompanying consolidated balance sheets of China Techfaith Wireless Communication Technology Limited and Subsidiaries (collectively, the "Company") as of December 31, 2016 and 2015, and the related consolidated statements of operations and comprehensive loss, changes in equity, and cash flows for the years then ended. Our audits also included the financial statement schedule (Additional Information-Schedule I). The Company's management is responsible for these consolidated financial statements. Our responsibility is to express an opinion on these consolidated financial statements based on our audits.

We conducted our audits in accordance with the standards of the Public Company Accounting Oversight Board (United States). Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement. The Company is not required to have, nor were we engaged to perform, an audit of its internal control over financial reporting. Our audits included consideration of internal control over financial reporting as a basis for designing audit procedures that are appropriate in the circumstances, but not for the purpose of expressing an opinion on the effectiveness of the Company's internal control over financial reporting. Accordingly, we express no such opinion. An audit also includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements, assessing the accounting principles used and significant estimates made by management, as well as evaluating the overall financial statement presentation. We believe that our audits provide a reasonable basis for our opinion.

In our opinion, the consolidated financial statements referred to above present fairly, in all material respects, the financial position of the Company as of December 31, 2016 and 2015, and the results of its operations and its cash flows for the years then ended, in conformity with accounting principles generally accepted in the United States of America.

/s/ Friedman LLP

April 27, 2017

165.    Friedman's statement was false and misleading because, as further set out below, (a) Friedman's audit deviated from PCAOB Standards, and (b) Friedman subjectively disbelieved and/or did not have a sufficient basis to state that China Techfaith's financial statements were presented in accordance with GAAP.

166.    PCAOB Standards mandated that Friedman conduct inquiries from non-managerial employees to identify undisclosed related parties or transactions. The 2015 Annual Report disclosed that Mfox was a related party. No reasonable auditor would have failed to determine that

China Techfaith had numerous related-party transactions beyond those disclosed as related party transactions in its 2015 Annual Report. As of December 31, 2015, China Techfaith was down to 118 employees. As set out above, China Techfaith's employees told Plaintiffs that internally employees refer to themselves as part of the Mfox Conglomerate. These employees told Plaintiffs that China Techfaith's business was actually moved to Mfox in 2012. Moreover, China Techfaith and Mfox shared offices. Accordingly, had Friedman conducted the inquiries of employees required by AS 2410.06 or reviewed public information as required by AS No. 9.7., Friedman would have discovered that Mfox was a related party and that the host of China Techfaith transactions with Mfox were related-party transactions.

167.    Further, China Techfaith was a mobile phone manufacturer. Yet in 2013 and 2014, it entered the real estate business. Had Friedman examined China Techfaith's unusual real estate transactions, Friedman would have determined that these transactions existed to benefit Mfox.

168.    Moreover, China Techfaith stressed the importance of its own brand names to China Techfaith's performance. For example, China Techfaith stated in its 2016 Annual Report: "We emphasized the brands of our mobile handset products because self-owned branded products offered a higher profit margin compared with mobile handsets we sold for our ODP business." Yet far from moving into the branded products marketplace, beginning in 2015, China Techfaith's branded products sales had fallen so low that China Techfaith stopped disclosing brand name phone sales separately.

169.    A simple search at the Trademark Office of the State Administration for Market Regulation of China, the sole government authority responsible for the registration and administration of trademarks in China, show that the trademark MOBIFOX was registered by

Mfox Technology in 2015, and a subsidiary of Mfox Technology applied to register the trademark 17FOX in 2012.

170.    Thus, had Friedman conducted even these minimal inquiries, it would have determined that Mfox was siphoning off China Techfaith's most valuable business lines.

171.    Further, an asset that is not owned or controlled by an entity should not be included in an entity's financial statements because it is not representationally faithful. Or, if such asset is included in the entity's financial statements, disclosure of its lack of ownership should be made. See FASB Statement of Financial Concepts No. 5.

172.    Here, China Techfaith's financial statements should have disclaimed ownership of its own brands because Mfox owned them instead.

173.    In the 2017 20-F, Friedman published an audit report, which provided in relevant part:

### REPORT OF INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM

To the Board of Directors and Shareholders
China Techfaith Wireless Communication Technology Limited

#### Opinion on the Financial Statements

We have audited the accompanying consolidated balance sheets of China Techfaith Wireless Communication Technology Limited and Subsidiaries (collectively, the "Company") as of December 31, 2017 and 2016, and the related consolidated statements of operations and comprehensive income (loss), changes in equity, and cash flows for each of the years in the three-year period ended December 31, 2017, and the related notes and schedules (Additional Information-Schedule I) (collectively referred to as the financial statements). *In our opinion, the consolidated financial statements present fairly, in all material respects, the financial position of the Company as of December 31, 2017 and 2016, and the results of its operations and its cash flows for each of the years in the three-year period ended December 31, 2017, in conformity with accounting principles generally accepted in the United States of America.*

#### Basis for Opinion

These financial statements are the responsibility of the Company's management. Our responsibility is to express an opinion on the Company's financial statements based on

our audits. We are a public accounting firm registered with the Public Company Accounting Oversight Board (United States) (PCAOB) and are required to be independent with respect to the Company in accordance with the U.S. federal securities laws and the applicable rules and regulations of the Securities and Exchange Commission and the PCAOB.

***We conducted our audits in accordance with the standards of the PCAOB.*** Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement, whether due to error or fraud. The Company is not required to have, nor were we engaged to perform, an audit of its internal control over financial reporting. As part of our audits, we are required to obtain an understanding of internal control over financial reporting, but not for the purpose of expressing an opinion on the effectiveness of the Company's internal control over financial reporting. Accordingly, we express no such opinion.

Our audits included performing procedures to assess the risks of material misstatement of the financial statements, whether due to error or fraud, and performing procedures that respond to those risks. Such procedures included examining, on a test basis, evidence regarding the amounts and disclosures in the financial statements. Our audits also included evaluating the accounting principles used and significant estimates made by management, as well as evaluating the overall presentation of the financial statements. We believe that our audits provide a reasonable basis for our opinion.

/s/ Friedman LLP

We have served as the Company's auditor since 2015.

New York, New York
April 27, 2018

174.    Friedman's statement was false and misleading because, as further set out below, (a) Friedman's audit deviated from PCAOB Standards, and (b) Friedman subjectively disbelieved and/or did not have a sufficient basis to state that China Techfaith's financial statements were presented in accordance with GAAP.

175.    PCAOB Standards mandated that Friedman conduct inquiries from non-managerial employees to identify undisclosed related parties or transactions. The 2015 Annual Report disclosed that Mfox was a related party. No reasonable auditor would have failed to determine that China Techfaith had numerous related-party transactions beyond those disclosed as related party transactions in its 2015 Annual Report. As of December 31, 2015, China Techfaith was down to

115 employees. As set out above, China Techfaith's employees told Plaintiffs that internally employees refer to themselves as part of the Mfox Conglomerate. These employees told Plaintiffs that China Techfaith's business was actually moved to Mfox in 2012. Moreover, China Techfaith and Mfox shared offices. Accordingly, had Friedman conducted the inquiries of employees required by AS 2410.06 or reviewed public information as required by AS No. 9.7., Friedman would have discovered that Mfox was a related party and that the host of China Techfaith transactions with Mfox were related-party transactions.

176.    Further, China Techfaith was a mobile phone manufacturer. Yet in 2013 and 2014, it entered the real estate business. Had Friedman examined China Techfaith's unusual real estate transactions, Friedman would have determined that these transactions existed to benefit Mfox.

177.    And as further set out above, in 2017, China Techfaith made an extremely unusual loan of 115% of its 2017 revenues that left it with only $700,000. On its face, the loan was to a party that had the same business address as China Techfaith. Thus, no reasonable auditor would have failed to make further inquiries and determine that the loan was to a related party. Finally, China Techfaith had previously disclosed the counterparty was a related party in its annual report for the year ended December 31, 2011.

178.    Moreover, China Techfaith stressed the importance of its own brand names to China Techfaith's performance. For example, China Techfaith stated in its 2017 Annual Report: "We emphasized the brands of our mobile handset products because self-owned branded products offered a higher profit margin compared with mobile handsets we sold for our ODP business." Yet far from moving into the branded products marketplace, beginning in 2015, China Techfaith's branded products sales had fallen so low that China Techfaith stopped disclosing brand name phone sales separately.

179. A simple search at the Trademark Office of the State Administration for Market Regulation of China, the sole government authority responsible for the registration and administration of trademarks in China, show that the trademark MOBIFOX was registered by Mfox Technology in 2015, and a subsidiary of Mfox Technology applied to register the trademark 17FOX in 2012.

180. Thus, had Friedman conducted even these minimal inquiries, it would have determined that Mfox was siphoning off China Techfaith's most valuable business lines.

181. Further, an asset that is not owned or controlled by an entity should not be included in an entity's financial statements because it is not representationally faithful. Or, if such asset is included in the entity's financial statements, disclosure of its lack of ownership should be made. See FASB Statement of Financial Concepts No. 5.

182. Here, China Techfaith's financial statements should have disclaimed ownership of its own brands because Mfox owned them instead.

## PLAINTIFF'S CLASS ACTION ALLEGATIONS

183. Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or otherwise acquired the publicly traded securities of China Techfaith during the Class Period (the "Class"); and were damaged upon the revelation of the alleged corrective disclosure. Excluded from the Class are Defendants herein, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

184. The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, the Company's securities were actively traded on

NASDAQ. While the exact number of Class members is unknown to Investors Bradley Thomas at this time and can be ascertained only through appropriate discovery, Investors Bradley Thomas believes that there are hundreds or thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by the Company or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

185.    Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

186.    Plaintiffs will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation. Investors Bradley Thomas has no interests antagonistic to or in conflict with those of the Class.

187.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

(a)      whether Defendants' acts as alleged violated the federal securities laws;

(b)      whether Defendants' statements to the investing public during the Class Period misrepresented material facts about the Company's business and operations;

(c)      whether Defendants' statements to the investing public during the Class Period omitted material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading;

(d)      whether the Individual Defendants caused the Company to issue false and misleading SEC filings and public statements during the Class Period;

(e)     whether Defendants acted knowingly or recklessly in issuing false and misleading SEC filings and public statements during the Class Period;

(f)     whether the prices of the Company's securities during the Class Period were artificially inflated because of the Defendants' conduct complained of herein; and

(g)     whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

188.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

189.    Plaintiffs will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

(a)     Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

(b)     the omissions and misrepresentations were material;

(c)     the Company's securities are traded in efficient markets;

(d)     the Company's securities were liquid and traded with moderate to heavy volume during the Class Period;

(e)     the Company traded on the NASDAQ, and was covered by multiple analysts;

(f)     the misrepresentations and omissions alleged would tend to induce a reasonable investor to misjudge the value of the Company's securities; Investors Bradley Thomas and members of the Class purchased and/or sold the Company's securities between the time the

Defendants failed to disclose or misrepresented material facts and the time the true facts were disclosed, without knowledge of the omitted or misrepresented facts; and

(g)      Unexpected material news about the Company was rapidly reflected in and incorporated into the Company's stock price during the Class Period.

190.    Based upon the foregoing, Plaintiffs and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

191.    Alternatively, Plaintiffs and the members of the Class are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of the State of Utah v. United States*, 406 U.S. 128, 92 S. Ct. 2430 (1972), because the Class's claims are grounded on Defendants' material misstatements and/or omissions. Because this action involves Defendants' failure to disclose material adverse information regarding the Company's business operations and financial prospects—information that Defendants were obligated to disclose—positive proof of reliance is not a prerequisite to recovery. All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in making investment decisions. Given the importance of the Class Period material misstatements and omissions set forth above, that requirement is satisfied here.

## COUNT I

**Violation of Section 10(b) of The Exchange Act and Rule 10b-5**

**Against All Defendants**

192.    Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

193.    This Count is asserted against the Company and the Individual Defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

194.    This Count is asserted against all defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

195.    During the Class Period, the engaged in a plan, scheme, conspiracy and course of conduct, pursuant to which they knowingly or recklessly engaged in acts, transactions, practices and courses of business which operated as a fraud and deceit upon Investors and the other members of the Class; made various untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and employed devices, schemes and artifices to defraud in connection with the purchase and sale of securities. Such scheme was intended to, and, throughout the Class Period, did: (i) deceive the investing public, including Investors and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of China Techfaith ADSs; and (iii) cause Investors and other members of the Class to purchase or otherwise acquire China Techfaith ADSs and options at artificially inflated prices. In furtherance of this unlawful scheme, plan and course of conduct, the 10b-5 Defendants, and each of them, took the actions set forth herein.

196.    Pursuant to the above plan, scheme, conspiracy and course of conduct, each of the Defendants participated directly or indirectly in the preparation and/or issuance of the quarterly and annual reports, SEC filings, press releases, audit reports, and other statements and documents described above, including statements made to securities analysts and the media that were designed to influence the market for China Techfaith ADSs. Such reports, filings, releases and statements

were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about China Techfaith's finances and business prospects.

197.    By virtue of their positions at China Techfaith or as China Techfaith's auditors, the Defendants had actual knowledge of the materially false and misleading statements and material omissions alleged herein and intended thereby to deceive Investors and the other members of the Class, or, in the alternative, the Defendants acted with reckless disregard for the truth in that they failed or refused to ascertain and disclose such facts as would reveal the materially false and misleading nature of the statements made, although such facts were readily available to the Defendants. Said acts and omissions of the Defendants were committed willfully or with reckless disregard for the truth. In addition, each of the Defendants knew or recklessly disregarded that material facts were being misrepresented or omitted as described above.

198.    Information showing that the Defendants acted knowingly or with reckless disregard for the truth is peculiarly within Defendants' knowledge and control. As the senior managers, CFO and/or directors of China Techfaith, Individual Defendants had knowledge of the details of China Techfaith's internal affairs.

199.    Individual Defendants are liable both directly and indirectly for the wrongs complained of herein. Because of their positions of control and authority, Individual Defendants were able to and did, directly or indirectly, control the content of the statements of China Techfaith. As officers and/or directors of a publicly-held company, Individual Defendants had a duty to disseminate timely, accurate, and truthful information with respect to China Techfaith's businesses, operations, future financial condition and future prospects. As a result of the dissemination of the aforementioned false and misleading reports, releases and public statements, the market price for China Techfaith ADSs was artificially inflated throughout the Class Period.

In ignorance of the adverse facts concerning China Techfaith's business and financial condition which were concealed by Defendants, Investors and the other members of the Class purchased or otherwise acquired China Techfaith ADSs at artificially inflated prices and relied upon the price of the securities, the integrity of the market for the securities and/or upon statements disseminated by the Defendants, and were damaged upon the revelation of the alleged corrective disclosures.

200.    During the Class Period, China Techfaith ADSs were traded on an active and efficient market. Investors and the other members of the Class, relying on the materially false and misleading statements described herein, which the Defendants made, issued or caused to be disseminated, or relying upon the integrity of the market, purchased or otherwise acquired shares of China Techfaith ADSs at prices artificially inflated by Defendants' wrongful conduct. Had Investors and the other members of the Class known the truth, they would not have purchased or otherwise acquired said securities, or would not have purchased or otherwise acquired them at the inflated prices that were paid. At the time of the purchases and/or acquisitions by Investors and the Class, the true value of China Techfaith ADSs was substantially lower than the prices paid by Investors and the other members of the Class. The market price of China Techfaith ADSs declined sharply upon public disclosure of the facts alleged herein to the injury of Investors and Class members.

201.    By reason of the conduct alleged herein, the 10b-5 Defendants knowingly or recklessly, directly or indirectly, have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

202.    As a direct and proximate result of the 10b-5 Defendants' wrongful conduct, Investors and the other members of the Class suffered damages in connection with their respective purchases, acquisitions and sales of the Company's securities during the Class Period, upon the

disclosure that the Company had been disseminating misrepresented financial statements to the investing public.

203.    During the Class Period, the Company and the Individual Defendants, individually and in concert, directly or indirectly, disseminated or approved the false statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

204.    The Company and the Individual Defendants violated §10(b) of the 1934 Act and Rule 10b-5 in that they: employed devices, schemes and artifices to defraud; made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and/or engaged in acts, practices and a course of business that operated as a fraud or deceit upon Investors Bradley Thomas and others similarly situated in connection with their purchases of the Company's securities during the Class Period.

205.    The Company and the Individual Defendants acted with scienter in that they knew that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated, or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the securities laws. These defendants by virtue of their receipt of information reflecting the true facts of the Company, their control over, and/or receipt and/or modification of the Company's allegedly materially misleading statements, and/or their associations with the Company which made them

privy to confidential proprietary information concerning the Company, participated in the fraudulent scheme alleged herein.

206.    Individual Defendants, who are the senior officers and/or directors of the Company, had actual knowledge of the material omissions and/or the falsity of the material statements set forth above, and intended to deceive Investors Bradley Thomas and the other members of the Class, or, in the alternative, acted with reckless disregard for the truth when they failed to ascertain and disclose the true facts in the statements made by them or other personnel of the Company to members of the investing public, including Investors Bradley Thomas and the Class.

207.    As a result of the foregoing, the market price of the Company's securities was artificially inflated during the Class Period. In ignorance of the falsity of the Company's and the Individual Defendants' statements, Investors Bradley Thomas and the other members of the Class relied on the statements described above and/or the integrity of the market price of the Company's securities during the Class Period in purchasing the Company's securities at prices that were artificially inflated as a result of the Company's and the Individual Defendants' false and misleading statements.

208.    Had Plaintiffs and the other members of the Class been aware that the market price of the Company's securities had been artificially and falsely inflated by the Company's and the Individual Defendants' misleading statements and by the material adverse information which the Company's and the Individual Defendants did not disclose, they would not have purchased the Company's securities at the artificially inflated prices that they did, or at all.

209.    As a result of the wrongful conduct alleged herein, Investors Bradley Thomas and other members of the Class have suffered damages in an amount to be established at trial.

210.    By reason of the foregoing, the Company and the Individual Defendants have violated Section 10(b) of the 1934 Act and Rule 10b-5 promulgated thereunder and are liable to the Plaintiffs and the other members of the Class for substantial damages which they suffered in connection with their purchases of the Company's securities during the Class Period.

## COUNT II

## Violation of Section 20(a) of The Exchange Act

## Against The Individual Defendants

211.    Plaintiffs repeat and reallege each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

212.    During the Class Period, the Individual Defendants participated in the operation and management of the Company, and conducted and participated, directly and indirectly, in the conduct of the Company's business affairs. Because of their senior positions, they knew the adverse non-public information regarding the Company's business practices.

213.    As officers and/or directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to the Company's financial condition and results of operations, and to correct promptly any public statements issued by the Company which had become materially false or misleading.

214.    Because of their positions of control and authority as senior officers, the Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings which the Company disseminated in the marketplace during the Class Period. Throughout the Class Period, the Individual Defendants exercised their power and authority to cause the Company to engage in the wrongful acts complained of herein. The Individual Defendants therefore, were "controlling persons" of the Company within the meaning of Section

20(a) of the Exchange Act. In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of the Company's securities.

215.    Each of the Individual Defendants, therefore, acted as a controlling person of the Company. By reason of their senior management positions and/or being directors of the Company, each of the Individual Defendants had the power to direct the actions of, and exercised the same to cause, the Company to engage in the unlawful acts and conduct complained of herein. Each of the Individual Defendants exercised control over the general operations of the Company and possessed the power to control the specific activities which comprise the primary violations about which Plaintiffs and the other members of the Class complain.

216.    By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by the Company.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs demand judgment against Defendants as follows:

A.    Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiffs as the Class representative;

B.    Requiring Defendants to pay damages sustained by Plaintiffs and the Class by reason of the acts and transactions alleged herein;

C.    Awarding Plaintiffs and the other members of the Class prejudgment and post-judgment interest, as well as their reasonable attorneys' fees, expert fees and other costs; and

D.    Awarding such other and further relief as this Court may deem just and proper.

**DEMAND FOR TRIAL BY JURY**

Plaintiffs hereby demand a trial by jury.

Dated: July 24, 2019                    Respectfully submitted,


**THE ROSEN LAW FIRM, P.A.**


By: /s/Phillip Kim
Phillip Kim
Jing Chen
275 Madison Avenue, 34th Floor
New York, NY 10016
Telephone: (212) 686-1060
Fax: (212) 202-3827
Email: pkim@rosenlegal.com
       jchen@rosenlegal.com

*Counsel for Plaintiffs and the Class*